## THE STATE OF KANSAS V. MARTIN ANDERSON, *Treasurer.*

### *Error from Shawnee County.*

1. INJUNCTION.—A final injunction will not be granted until all the parties whose legal rights are to be directly effected by it are made parties to the action.

2. PARTIES.—In a suit to enjoin the treasurer of the state from paying over the proceeds of the sales of the 500,000 acres of land granted to several railroad companies by the act of 1866, the said companies are proper and necessary parties.

3. JURISDICTION.—Where it appears that a suit is instituted in the name of the state, without any authority of law or the consent of the attorney general, is the state properly in court? [1]

The petition in this case was sworn to by P. McVicar, superintendent of public instruction of the state, and in that affidavit he also averred that as such officer he had charge of the school interest of the state, and that the action was instituted at his instance for the protection of said interest.

Other facts in the case are fully set forth in the opinion of the court.

*Thacher & Banks*, for plaintiff in error.

*Thos. Ryan* and *Geo. H. Hoyt, Attorney General*, for the defendants in error.

*For plaintiff in error*, on the questions determined by the court, it was submitted:

1. The remedy sought in the present case is the proper one.

---

1. PARTIES: TREASURER.—Under the act of the legislature of February 23d, 1866, (L. '66, p. 147) the state treasurer is the mere custodian of the fund proceeding from the sale of the 500,000 acres of land granted to the state by act of Congress of September 4th, 1841, and is not otherwise interested therein, and is properly a mere nominal party to an action brought for enjoining the payment over thereof.

2. PARTIES: THE STATE.—Semble, the superintendent of public instruction has no authority of law for bringing an action in the name of the state—the state acts through her proper law officer—the attorney general, in protecting and enforcing her rights of property.

*a*)  The code of 1868 is broader with respect to this remedy by injunction than that of 1862. In the latter, section 247, the injury, to warrant this remedy, must be great or irreparable; in the former it needs only to be an injury. *Section* 238. That the conveyance of these lands will be a cloud on plaintiff's title and hence an "injury," is admitted. The state can restrain its officers from clouding its title to any lands it may own.

*b*)  The remedy is familiar to the authorities: In Mohawk & Hudson R. R. Co. v. Artchers [6 *Paige*, 83] it is expressly held that injunction will lie "where public officers, under a claim of right are proceeding illegally and improperly to injure or destroy the real property of an individual or corporation, or where it is necessary to prevent a multiplicity of suits." *See also* 31 *How. Pr. R.*, [1866] *pp.* 331–7 *and note; Belknap v. Belknap*, 2 *John. Ch. R.*, 463; *Livingston v. Livingston*, 6 *id.*, 497; *Bradley v. Com'rs*, 2 *Humph.*, 428; *Cooper v. Alden, Harr. Ch. R.*, [*Mich.*] 72; *Curt. Eq. Prec.*, 132.

*c*)  It may be observed that the three officers mentioned in the act of the legislature,—the governor, the treasurer, and the agent,—each of whom has a part to perform in the sale of the lands, are the only persons who could well be made parties to an action of this nature. It is certain the different railroad companies are not proper defendants, since they have no active hand in divesting the state of its title. They receive the moneys from the state treasurer, for which the lands were sold. But they do not sell the lands, or give title. If injunction lies at all it must be to restrain the officers from illegally selling the lands. Here is the fountain whence the illegal stream flows. Any one or all of these agents in disposing of the lands may be restrained from committing the act com-

plained of.   The action proceeds on the same grounds as one against treasurers collecting illegal tax.   They act, it is true, as sort of trustees, for those to whom the funds go, and have no individual interest in the matter, yet they are the only persons to be restrained.   Of the same nature are actions to restrain sheriffs or other ministerial officers from selling lands under a void process, or for other causes rendering the judgment invalid.

Moreover, the point is fairly presented to the court by both sides, and both unite in asking a decision of the main point.   Under such circumstances, the court will not decline to dispose of the main question on its merits. *The State ex rel. v. School Fund,* 4 *Kan.,* 261.

2.   On the question submitted by agreement and referred to in the opinion, the following suggestions were submitted by plaintiff:

FIRST.   What is the status of these five hundred thousand acres of land under our constitution and the act of the legislature donating them to railroads?

There can be no dispute as to the terms of section three of article six of the constitution.   It explicitly and "inviolably appropriates" these lands,—this magnificent domain,—"to the support of common schools."   The people made this part of their fundamental law superior, as all adjudications show, to any legislative enactment.

The legislature is the creature of this fundamental law; it has such powers as are therein conferred on it, and none other.   All powers not delegated in the constitution "remain with the people."   § 20, *Bill of Rights.* The power to alter, abrogate, or nulify any part or parcel of the constitution, to infract any one of its manifold provisions, is nowhere given to the legislature; indeed, it was impossible that such an anomalous power should

be given.   It would contravene the very idea of a funda-
mental, supreme law.    It is equally clear that each
provision of the constitution, as far as those are con-
cerned who derive authority from it, is binding in the
same degree with every other part.    One provision is as
imperative and unalterable as another to all who come
under the requirements of the instrument.

These general propositions are not likely to be con-
travened.   But it will be insisted that that portion of
section three of article six, under consideration, is simply
nugatory, because it seeks to divert the lands from the
purpose designated in the act of Congress donating them
to the state.    And upon this proposition alone can be
maintained the validity of the act of the legislature.   If
it cannot find sanction here, it fails altogether.

There are several valid answers to this proposition :

*a*)   The point has, as we insist, been already adjudi-
cated by this court.   [*The State ex rel. of Watson v. Cobb*,
2 *Kan.*, 32.]    This case is far stronger than the one
under consideration, since it is manifest that the state
constitution could not dictate to the federal authority the
qualifications of its officers ; whereas in the present case,
at the broadest, it is a different appropriation of an un-
qualified gift to the state of public lands from that
suggested in the act of donation.    But the court say
that the provision of section thirteen of article three of
the constitution, debarring a justice of the supreme
court from holding any office under the United States
during the term for which he was elected, was " an un-
changing and an unbending rule, from which there was
no escape.   The court there uphold the authority of the
constitution, insist upon its observance, and deprecate
any violation of its primary mandates.   If that case may

be relied on as a correct exposition of the true weight of the constitution in those features where they seem to come in contact with the national authority, it must be decisive of this case. The constitution must stand as long as it does not enjoin any duty or obligation inconsistent with the paramount allegiance due the general government. This view of the constitutional provision, with respect to this identical matter, does not rest on an inference or upon the defect of the decision in second Kansas, but we find it affirmed in Doll v. Meador, [16 *Cal.*, 295;] Kile v. Tubbs, [23 *id.*, 432;] Terry v. Magere, [24 *id.*, 609.]

The second section of article nine of the constitution of California is nearly identical with the section of our constitution under examination. The Supreme Court holds that the constitution is binding; that the title of the state is absolute, with no restriction upon her power save as to form and quantity of lands located under the grant.

*b*) The provision in our consititution may be construed as a refusal to receive the lands, except for the purpose designated. It cannot be claimed but that the state had the power to accept or decline the gift. There can be no compulsion in such a case. For the sake of the argument here advanced, we may concede that Congress, in admitting Kansas, did not assent to this diversion of the lands, yet it leaves the obligation on the legislature, and all others claiming authority under the constitution, unimpaired, to observe its solemn sanctions; they are not relieved from its mandates and prohibitions. The legislature can do nothing contravening the decision of this ultimate umpire.

*c*) Proceeding still on the assumption that Congress

did not assent to the devoting of these lands to common schools, by admitting Kansas into the union with that provision in her constitution, and admitting, as is claimed, that the State could use these lands only for purposes of internal improvement, yet the law must be held a nullity since it seeks to dispose of these lands without a vote of the people. It is clear that the words "school lands," in section five of article six, mean such lands as are mentioned in section three of that article; and as there never has been any authority to sell these lands given by a vote of the people, the law, and all its provisions as to sales, patents and distributions, fall to the ground.

*d*) If these lands belong to the state for purposes of internal improvement only, yet the legislature has no power over them until authorized by a vote of the people. The only sale of lands authorized by a vote of the people, is that of the sixteenth and thirty-sixth sections. *Chap.* 109, *Laws* 1864. No proposition as to these lands has ever been submitted. The prohibition of any disposal of them, except by a vote of the people at a general election, is clear and peremptory.

There is one sweeping clause as to all lands mentioned in section three, under the denomination of "school lands." And this clause is obligatory whether the lands may be held for common school purposes or not. No title to them can be given without a due authorization by the people.

It is in the knowledge of at least one member of this court, that liberal foresight for the children of the State, a generous endowment of the common schools, a permanent, inalienable, and undiminishable fund,—one that might ever grow larger, but never less—for the education of the children of the state for all time, was an object

dear to the thoughtful solicitude of the framers of the constitution, and that in section three, of article six, they believed they had secured that beneficient purpose, guarded, as it was, by the bulwark of section five, against hasty or improvident legislation. This noble endowment of our common school system received the hearty and earnest approbation of all classes and parties in the nascent state. On almost every other topic treated of by the constitution, there were acrimonious debates; but this caring for the children through all the oncoming life of the State, was felt by all to be a providence and wisdom "worthy of all commendation."

It must be very grave and cogent reasons that can justify the obliteration of a provision hailed with such general approval, and so wise and elevated in its aim.

*e*) The ninth section of the act of September 4, 1841, defines what objects of internal improvements were in contemplation by Congress at the time the grant was made, and this enumeration, we hold, shows that the latter clause of that section cannot be construed into a contract, because one of the improvements mentioned is the " draining of swamps."

The provision in the latter part of section nine, is as follows : " And such roads, railways, canals, bridges and water-courses, shall be free for the transportation of the United States mail, munitions of war, and for the passage of their troops, without the payment of any toll whatever."

So that if the state should devote these lands to the "draining of swamps," there would nothing remain in favor of the United States. In other words, the state would be under no sort of obligation to the general government, were these lands used for the reclamation of swamp lands. Hence we conclude that as one object of

internal improvement could be aided by the grant, without any relation between the beneficiary and the general government arising, it was not so paramount an idea of Congress, in making the grant, to procure easy transportation for its uses, as to assist, in the most practicable way, in developing the country. And if this view is correct, it will not be difficult to maintain that the erection of schools, in the widest sense of that word, has become a means of opening the country and developing its resources, by going to the foundation and making, in the intelligence of our population, their enterprise and thrift, a power not only to build roads, railways and canals, but all other internal improvements.

In other words, we can see full as adequate reason for Congress to allow Kansas to expend the five hundred thousand acre grant on her schools, without asking anything directly in return, as we can in allowing their use in draining swamps, without return.

The fee simple of these lands is in the state. 5 *U. S. Statutes*, 455; 10 *id.*, 346; *Brightly's Dig.*, 491, 492. Foley v. Harrison, 15 *How.*, 433, was decided before August 3, 1854, the date of the approval of the act, found in 10 United States statutes, 346; and this act was evidently passed to meet that decision. *See also Doll v. Meador,* 16 *Cal.*, 295.

The general government attached no proviso or limitation to the gift; the title to these lands vested absolutely in the state on their selection and the furnishing of the lists as required by law.

No reversion is provided for to the United States, no matter to what use they may be put. The consideration or moving purpose of the Congress in making the grant was "internal improvement" in the different states, but

there is no inhibition upon the states from using the lands for any other purpose, nor does any condition hamper the donation. The federal authority relied upon the wisdom and good sense of the states to use the gift as they should deem best. The reason of the grant was given but no restriction was made to accompany it.

Neither can it be said that the conveyance to the state is in trust, since the state is both the trustee and beneficiary or *cestui qui trust.* *Hill on Trustees,* 373.

The state can no more hold title in trust for itself than can an individual. Owning these lands in fee simple the state had the fullest authority to dispose of them as it has done in the constitution. A kind father conveys to his son a farm for the purpose of a home but retains no title in himself and accompanies the transfer by no conditions. It is clear that the son, if he sees fit, may sell the estate and use the proceeds in trade, or in riotous living without let. So here, the Congress saw fit to donate to the state these lands for the purpose or reason described, as "internal improvement," but allowing the state the fullest title to the lands, and trusting to the state to apply the proceeds of lands as it should deem best.

In Stanly v. Colt [5 *Wall.,* 119] there was a devise of land to trustees, with no power of alienation, for charitable uses. In the process of time it became necessary for the benefit of all concerned to sell the estate, though it was in direct contravention of the will. The state legislature authorized the sale and the heirs of the testator brought suit for the estate as for condition broken. But the Supreme Court not only held that the legal title of the estate was in the trustee, but that it was competent for the legislature to authorize the sale. From which

we conclude the legal estate of these lands is in the state, and certainly the equitable estate is also, and the disposition made of them by the highest authority in the state must conclude all who acknowledge that authority. So far as Congress is concerned these lands are owned in fee by the state, but yet the state owns and holds these lands in trust for common school purposes. Nothing less than a change of the fundamental law can destroy this trust.

SECOND. Thus far we have proceeded on the ground that no action has been taken by the United States assenting to the direction given these lands in the constitution. And this brings us to the second proposition which, broadly laid down, is this:

That Congress in admitting Kansas into the Union with our constitution, expressly assented to the provision respecting these lands, as set forth in section three, article six.

*a*) The constitution of the state was examined by Congress before the admission of the state and was declared, in the preamble to the act admitting the state, to be "republican in form." [*See preamble to act admitting California*, 9 *U. S. Statutes*, 452.] There Congress declares that a "due examination" has been made of California's constitution.

Now we take these words to mean that Congress found the different provisions of the constitution to be not only free from monarchical and aristocratic features, with no rules of caste, of primogeniture, no hereditary rights and privileges, but also found it in harmony with the constitution of the United States, and, of course, all laws passed under its authority. The constitution of the United States stands not only as the supreme law of the land, but must be the arbitrer by which the republicanism of the different state constitutions must be measured.

A state constitution that contravenes a provision of the constitution of the United States, or of a law flowing from its authority, cannot be called "republican in form," since it is at open war with the vital, controlling law of the republic.

Now Congress, in declaring the constitution of the State of Kansas to be in accord with the paramount law, must have held that section three of article six was a just and proper disposition of the lands in question on one of two grounds, or perhaps on both.

a. For the reasons advanced in the former part of this argument, that is, that it was such a disposition of the lands as might be fairly brought within the words of the grant, and that it was a question solely for the decision of the state itself; or

b. That Congress was willing, and therefore assented, that the lands should be used as designated.

*b*) That Congress intended to assent to this provision of the constitution seems the more evident when attention is had to the fact that the ordinance to the constitution, and which was no part thereof, was not assented to by the act of admission, as declared in section three of the act of admission. Care is used to show that the ordinance does not meet with the assent of Congress, while the constitution itself is left undissented from in any particular. If Congress did not concur with the provisions of the constitution on this subject, why did it take the trouble to negative its assent to the ordinance and say nothing touching the constitution save to declare it "republican in form?" The ordinance was no part of the constitution; was a simple proposition and evanescent: the constitution was an organic law,—unalterable by legislation,—permanent.

Moreover, that Congress must have held itself bound by the disposition of the lands mentioned in the constitution can fairly be inferred from this, that there were in the ordinance several distinct propositions made to Congress touching the public domain and its disposition in Kansas, the seventh one having reference to the lands in question. Congress responds to these different propositions, modifying them in some instances, but is silent entirely as to the seventh and the fourth. As to the latter, it may be observed that no grant has ever been made to the state for the object mentioned, either before or since admission. But as to the seventh, the grant was already made and vested in the State at the instant of its admission, and became perfect on the selection and listing of the lands.

It would do one no credit to say that Congress examined the ordinance or resolutions accompanying the constitution of Kansas, and did not scrutinize the constitution itself.

That Congress did not dissent from the propositions mentioned in the ordinance must be apparent from the fact that it did substantially accede to many of them.

The language of section three of the act of admission does not at all mean that Congress refuses each and every proposition in the ordinance and resolutions of the constitution, because, in the same section, it proceeds to assent to them.

It would seem that Congress deemed that these propositions, instead of coming from the state, should emanate from the general government.

Congress simply said : "We decline to consider propositions of this nature coming from a state, but submit to you certain propositions covering the subject matter of powers.

" But as to the five hundred thousand acre grant that is already the property of the state, and your constitution, which has been considered by Congress, disposes of it to the satisfaction of the United States."

Such we deem to be the fair deductions from the act of Congress in admitting Kansas, with its constitution.

That Congress must have held these lands already disposed of by the constitution in accordance either with its views, or of the undoubted right of disposal by the state, seems to be a just conclusion.

*c*) But we are not left to conjecture or inferential argument on the question. Many new states have devoted these lands to their common schools, as has Kansas. Indeed, our own provision was almost a transcript of the constitutions of Iowa and California. Section two of article ten of the constitution of Iowa, framed in 1846, and section two of article nine of the constitution of California are, in their general provisions for the perpetual school fund, like our own.

Iowa was admitted into the union December 28th, 1847. [9 *U. S. Statutes*, 111.] This act is entirely silent as to the different provisions of the constitution, but simply places Iowa in the Union on an equal footing with the other states. March 2d, 1849, Congress, to set at rest the effect of the act of admission upon this provision of the constitution of Iowa, passed an act declaratory of the act of admission. [9 *U. S. Statutes*, 349.]

It is so complete and apparently conclusive that we may be excused for quoting it *in extenso:*

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled:* That *by* the act entitled ' An act for the admission of the State of Iowa into the Union,' approved December twenty-

eighth, eighteen hundred and forty-six, the United States assented to the application for the support of common schools, as made in the second section of the tenth article of the constitution of said state, of the five per cent. of net proceeds of the sales of the public lands within the State of Iowa, *and of the five hundred thousand acres of land granted to said state by the act of the fourth of September, eighteen hundred and forty-one;* said land to be selected in legal subdivisions of not less than three hundred and twenty acres."

The effect of this declaratory act ·on all other acts of the like character can hardly be doubted. It would be idle to say that the effect of one act was different from another of precisely the same character and design.

This act is declaratory not only of the meaning of the act admitting Iowa but of all other acts of like nature and object. It is presumed that the law-making power means the same thing in repeated acts of the same scope. It would be doing a flagrant violation to the uniform construction of statutes to say that in finding the effect of one law you do not find the effect of all other laws of the same general purport. Legislative construction of statutes is of the highest kind, and especially is this true where the interpretation precedes the enactment.    *Sedgw. on Stat. and Const. L.*, 252.

If by admitting Iowa into the Union under her constitution consecrating these lands to common schools Congress assented to the dedication, equally must the same effects flow from the admission of Kansas into the Union. Like causes produce like results. Kansas made no experiment in using the lands for an inviolable school fund. She followed a beaten path along which already had passed her sisters : Wisconsin, Iowa, California and Oregon, and her footsteps have been followed by Nevada.

The declaratory act of Congress was passed March 2, 1849, and California was admitted into the Union September 9, 1850. The terms of the act admitting California are substantially those employed in admitting Iowa. Can there be any doubt as to their having the same import in the one case as in the other? Can any principle of legal construction be suggested why statutes in *pari materia* should not receive the same force?

While it is not at all decisive yet it may not be uninstructive to note the fact that the commissioner of education, Henry Barnard, appointed under an act of Congress, approved March 2, 1867, requiring him to report to Congress such "facts and recommendations as will, in his judgment, subserve the purpose for which this department is established," in his first report recites the educational provisions of the constitutions of different states, among which occur the one now under consideration as well as those of the other states who have used the proceeds of the five hundred thousand acre grant in the same way. And nowhere does the commissioner intimate that this appropriation of land is unauthorized; neither, although its attention has been called to it in this formal way, does Congress raise a query whether its bounty has not been turned aside from its destination?

Indeed, Mr. Barnard calls attention to the cheering and hopeful fact that the necessity of a large and generous provision for the diffusion of knowledge among the people is taking a deeper hold on the public mind, and that "within the last half century the constitutions of the states admitted from time to time into the Union have become more and more emphatic in the declaration that it is the wisest economy and the highest duty to provide for an efficient and uniform system of public schools." *An. Rep. Dept. Ed.* 1867-8, *p.* 83, *et seq.*

In the law authorizing the sale of the sixteenth and thirty-sixth sections it is provided that there shall be no sale for a sum less than three dollars per acre. Taking this minimum value as the fair average worth of the body of lands in question and we have an aggregate enhancement of our "inviolable common school fund" of one million five hundred thousand dollars, affording a clear annual income, at our usual rate of interest, of one hundred and five thousand dollars. What a weight of taxation will this large revenue each year lift from the people. What a bright assurance does it afford that intelligence, with all its rich and life-giving influences, shall be free to every child of the state for all time.

It must be a bold hand that dares to pluck this golden fruit from the mouths of our children. The tree of knowledge, striking its roots deep into this perennial income, will be clothed with perpetual verdure, and each year bend beneath ample fruitage. Let this fountain be dried and the tree droops and fails of half its treasure.

*A. Danford, Attorney General,* and *B. F. Simpson, for defendants in error,* submitted on the question agreed upon :

1.   The act of Congress of September 4th, 1841 [5 *U. S. Stat.,* 455] is a legislative grant in the nature of a contract.   2 *Kent's Com.,* 481 ; 2 *Wash. Real Prop.,* 532, *et seq.* ; *Fletcher v. Peck,* 6 *Cranch,* 87 ; *Terrett v. Taylor,* 9 *Cranch,* 43 ; *Dartmouth College v. Woodward,* 4 *Wheaton,* 519 ; *Opinions of Att'y Gen., Vol.* 1, 640 ; *id., Vol.* 8, 321.

*a)*   It is well settled that all public grants of lands, money, etc., are to be strictly construed against the grantee.   Whatever is not expressly given or very clearly implied, is withheld.   *Charles River Bridge v.*

*Warren Bridge*, 11 *Peters*, 420; *Richmond R. R. Co. v. Louisa R. R. Co.*, 13 *Howard*, 81; *Ohio Life. Insurance Co. v. Debolt*, 10 *Howard*, 81; *Sedgwick on Statutory and Const. Law*, 662; *Litchfield v. Dubuque R. R. Co.*, 23 *Howard*, 333.

*b*) This is most especially true of legislative grants. *Opinions of Att'y Gen. Black, of Nov.* 22, 1858; *Lesler's Land Laws*, 503.

*c*) It is no less a contract because the state is a party. *Fletcher v. Peck*, 6 *Cranch*, 87.

2. The act of 1841 vested the fee to these lands in the State of Kansas in trust, and the mode in which the trust shall be executed is prescribed in the act making the grant. *United States v. Percheman*, 7 *Peters*, 51; *Mitchell v. United States*, 9 *Peters*, 711; *United States v. Brooks*, 10 *Howard*, 442; *Lessevir v. Price*, 12 *Howard*, 59; *Ladiga v. Rowland*, 2 *Howard*, 581; *Godfrey v. McLain*, 2 *McLean*, 412; *Opinions of Att'y Gen.*, 9 *Vol.*, 41; 13 *Mo.*, 112; *Opinions of Att'y Gen.*, *Vol.* 1, 420; 1 *id.*, 321; 2 *id.*, 44; 2 *id.*, 191; 2 *id.*, 550; 2 *id.*, 578; 5 *id.*, 179; 5 *id.*, 574; 6 *id.*, 732; 8 *id.*, 244, 247, 255; 9 *id.*, 346.

*a*) But the fee to these lands did not vest in the state until the selections of the commissioners appointed by the governor to locate the land made a report of the location, and the selections were approved by the commissioner of the general land office. 10 *U. S. Stat.*, 346; 5 *id.*, 455; *Foley v. Harrison*, 15 *Howard*, 433; 1 *Wallace*, 333; *Session Laws of Kansas*, 1861, 164.

3. The people of Kansas have made two distinct attempts to appropriate these lands to school purposes, in violation of the terms of the original grant.

*a*) By the ordinance attached to the constitution.

*b*)   By a provision in the constitution, section three, article six.

4.   It will not be claimed that the great "*ex vi termini*" contemplates an appropriation of these lands, or the proceeds of the sale thereof, to the schools of the state.  It is claimed that Congress, by the passage of the act of admission of Kansas into the Union as a state, assented to the diversion of the land from the original purpose to the permanent school fund of the State of Kansas.

*a*)   Congress expressly dissented from all the propositions contained in the ordinance.    *Sec. 3, Act of Admission.*

Section seven of the ordinance contained an attempt at the diversion of these lands.

Congress submitted substantially to the people of Kansas, for their acceptance or rejection, the first six propositions contained in the ordinance, omitting all mention or reference to the seventh, which contained the attempted diversion.

*b*)   Congress did not assent to the diversion contained in the seventh section of the ordinance for two reasons.

Congress expressly dissented to the ordinance.

Congress submitted to the people of Kansas substantially the first six propositions of the ordinance, carefully omitting all mention, reference or notice of the land granted to the state by the act of September 4th, 1841.

*c*)   Section three, article six, of the constitution of the State of Kansas, appropriated the proceeds of the sale of these lands to the permanent school fund of the state, and it is claimed that Congress, by the act of admission, assented to this disposition.    To sustain this

view the plaintiff is forced to adopt the irresistable legal conclusion that the grant of September 4th, 1841, is a contract, and that Congress, one of the contracting parties, at the solicitation of the State of Kansas, the other party to the contract, assented to a change from the original conditions of the grant or contract.

*d*) If there was a change in the contract, that fact must be affirmatively shown. The plaintiff, claiming by virtue of the change, must establish it.

*e*) The ordinance attached to the constitution, and the constitution, each contained a provision, identical in language and effect, attempting a change. Congress, in dissenting from one dissented from the other. The express dissent of Congress to the provision of the ordinance is contained in the act of admission. Yet it is claimed that by the same act of admission Congress assented to the provision in the constitution. In other words, Congress, by dissenting from a provision in one part of the constitution, assents to a similar provision in another part of the same instrument.

*f*) The silence of Congress as to the provisions of the constitution, afford the counsel of the plaintiff their only argument.

*g*) The proposition that "silence gives consent" has never been adopted as a maxim of the law.

*h*) The will of Congress is as clearly established by what it had not declared as by what it expressed. *Houston v. More,* 5 *Wheaton,* 1; *Prigg v. Pennsylvania,* 16 *Peters,* 539.

*i*) Congress having enumerated, in the act of admission, the lands granted the State of Kansas for school purposes, excludes all other land. *Expressio unius est exclusio alterius* is a maxim that applies to this case with

all its vigor. *Brown's Legal Maxims,* 581; *Swickard v. Bailey,* 3 *Kan.,* 507.

*j*) The *assent* of a party to the original contract, or to a change in the terms or conditions thereof, is not to be presumed. Where one party has partially executed the contract, the assent of the other will not be presumed. 1 *Pars.,* 475, *note " c " and authorities cited in note.*

*k*) If *silence* could be tortured into a mere affirmation it would not be *assent.* 1 *Pars.,* 475.

*l*) That the action of Congress in admitting the State of Kansas into the Union did not of its own force assent to this diversion of the land granted by the act of September 4, 1841, is manifest, by the legislation had in reference to the same subject in the admission of the following states: 1. The State of Iowa in 1846 [9 *Stat. at L., p.* 147] was admitted into the Union with a constitutional provision [*Sec.* 2, *Art.* 10] appropriating the land granted that state by the act of September 4th, 1841, to school purposes. The act of admission contained no dissent to the diversion by the constitutional provision, but Congress did dissent to " all claims and demands of Iowa contained in the ordinance to the constitution." Congress afterwards passed a declaratory act [9 *Stat. at L.,* 349] giving an express assent to such a disposition of the land. 2. The State of Wisconsin, by a constitutional provision, donated the land granted by act of September 4th, 1841, to the purposes of education, [*Sec.* 2, *Art.* 10,] and in the resolutions [4] attached to the constitution a similar disposition was made of these lands. In the act of admission of the State of Wisconsin into the Union [9 *Stat. at L.,* § 3, *p.* 179] Congress gave its express and formal assent to this diversion. *See also* 9 *Stat. at L. pp* 233, 234, 235. 3. The State of Nevada, by a constitutional

provision, attempted a like disposition of the land granted by act of September 4th, 1841. This state was admitted into the Union by a proclamation of the President of the United States of date October 31st, 1864, [13 *Stat. at L.*, 749,] in pursuance of the provisions of an enabling act, [13 *Stat. at L.*,] both of which were silent as to the land granted by the act of September 4th, 1841. On the fourth day of July, A. D. 1866, Congress passed an act which provides: " That the appropriation by the constitution of the State of Nevada to educutional pur- poses of the five hundred thousand acres of land granted to said state by the law of September 4th, 1841, for pur- poses of internal improvement, is hereby approved and confirmed." *Acts*, 1*st Ses.* 39*th Con.*, *p*. 91.

5. The case of the States of Iowa and Wisconsin are exactly similar in all their features to the one at issue. In each attempts were made to divert this land from the original purposes of the grant " internal improvements " and appropriate it to school purposes; in each the attempt at diversion was contained in the constitutions and in the ordinances of the conventions; in each, Congress admitted the states dissented from the claims and demands con- tained in the ordinances; in each, Congress was silent as to the provisions attempting the diversion in the consti- tions; and in each, Congress afterwards by special enact- ment gave an express and formal assent to the disposition of lands, as proposed in the constitutions of these states.

6. The case of the State of Nevada is still stronger. In this case there was no ordinance and consequently no similar provision to that contained in the constitution. Congress did not express a dissent but admitted the state with this constitutional provision and afterwards passed an act confirming and ratifying the diversion.

7.   The action of Congress in reference to these states afford both a legislative and contemporaneous construction of the act admitting Kansas into the Union.   *Sedgw. on Stat. and Cons. L.*, 251; *Stuart v. Laird*, 1 *Cranch*, 299.

8.   The legislative exposition of statutes by the same body that passes the act is of great weight, it not only being their constitutional right to pass the law, but also to declare its meaning and effect.

9.   All acts in *pari materia* are to be taken together as if they were one law.   *State of Indiana v. Springfield T.*, 6 *Ind. R.*, 83; *Opinions of Att'y Gen.*, *Vol.* 2, 44.

10.   The following acts of Congress upon the subject of public lands granted to states for the purpose of internal improvement, schools and state universities, are cited for the purpose of establishing the proposition that there is not a single instance in the whole history of congressional action upon this subject, that where land is granted to a state for certain specific purposes, and that land has been diverted from the original purposes of the grant, but what that diversion has received a formal and express assent by Congress, clear and explicit in its terms.   Land granted to the State of Alabama by act of September 4th, 1841, [9 *Stats. at Large*, 281;] lands granted to the State of Arkansas, [9 *Stats. at Large*, 42;] land to Mississippi, [9 *Stats. at Large*, 237;] school lands to Illinois, Arkansas, Louisiana and Tennessee, [5 *Stats. at Large*, 600;] state university lands of Nevada, [*Acts*, 1*st Ses.* 39*th Con.*, 91.]

11.   Section three, article six, of the constitution of the State of Kansas, is in conflict with the act of September 4th, 1841, and is a plain violation of clause two, section one, article six, of the constitution of the United States, and must yield to the act of Congress.   *Smart, et*

*al. v. Davenport, et al.*, 22 *Howard*, 227; *Brown v. State of Maryland*, 12 *Wheaton*, 448, 449; 5 *Howard*, 573; 2 *Peters*, 251; 4 *Wheaton*, 405; *Blue Jacket v. Com'rs Johnson Co.*, 3 *Kan.*, 299.

12.   The act of the legislature of the State of Kansas of February 23d, 1866, being in strict obedience to the act of September 4th, 1841, and having been passed to enable the state to execute the trust imposed by the act of Congress, is valid and binding.

13.   The court will not declare the act of February 23d, 1866, invalid, unless it clearly appears that it is so. The presumption is that it is valid. 1 *Cowen*, 564; 26 *Wendell*, 99; 3 *Denio*, 581; 20 *Wendell*, 382; 3 *Selden*, 109; 3 *S. & R.*, 63, 73; 6 *Cranch,* 128; *Sedgw. Stat. and Const. Law*, 126–7, 482; *Foster v. Era Bank*, 16 *Mass.*, 245; 6 *Cranch*, 87; 3 *Scam.*, 2; 1 *Douglas, Mich.*, 352; 5 *id.*, 251; 1 *Ohio S. R.*, 82; *Atchison v. Bartholow*, 4 *Kan. R.*, 124.


*By the Court*, KINGMAN, C. J.


A petition was filed in the district court of Shawnee county, showing that the defendant was treasurer of the State of Kansas; that the State of Kansas holds in trust, and holds the title to the 500,000 acres of land granted by the act of Congress, approved September 4th, 1841; and that the lands are the same described in section three of article six of the constitution of this state; and the same lands described in an act of the legislature of this state, entitled " an act providing for the sale of public lands to aid in the construction of certain railroads, approved February 23d, 1866." The petition further shows that a portion of the money arising from the sale

of the lands made under the provisions of the last men-
tioned act, have been paid into the treasury of the state,
and that the defendant is about to pay it out to the rail-
road companies, entitled to receive it, under said act of
the legislature; and is about to receive other moneys
arising from the sale of lands aforesaid, and give receipts
therefor.   The petition further alleges that said act of the
legislature is unconstitutional and void, and that all acts
done under it embarrass and cloud the title of the plaintiff
to the said lands, and tend to embarrass the plaintiff in
its discharge of the trust imposed upon it by the consti-
tution; that said lands and all the proceeds arising from
the sale thereof, of right, belong to the schools of the
State of Kansas, and that defendant ought not to pay
over said moneys, now in the treasury, to the railroad
companies, nor issue receipts for moneys on the sale of
said lands, and asks that he may be enjoined from so
doing.

The defendant, Anderson, entered his appearance and
admitted that the facts set up in the petition were true,
and agreed that the injunction should issue if the act of
the legislature, approved February 23d, 1866, above re-
ferred to is invalid, and if this law should be declared
valid, then the injunction should be refused.   It was
further agreed that the sole question submitted was as to
the validity of the said act, and that the allegations set
forth in the petition are sufficient to raise that question;
and all other questions that might arise on the record are
withdrawn from the consideration of the court.   This
agreement is signed by the defendant and by Messrs.
Thacher & Banks, attorneys for the plaintiff.   The district
court refused to grant the injunction prayed for, and the
plaintiff brings the case to this court to review and re-

verse the order denying the injunction. The only question argued in this court is the one submitted to the district court by the stipulation of the parties.

But whatever may be the opinion of the court on that question, if the court below rightfully refused the injunction, we can do nothing more than affirm the decision; and we think the court very properly refused to grant the injunction for the reason that the proper parties were not before it. The order sought in this case was not a preliminary injunction—the granting of which is permitted by the two hundred and thirty-eighth section of the code, but the final order or judgment in the case; and it has uniformly been held as sound doctrine that the powers of injunction should be applied with the utmost caution. It is the strong arm of the court, and to render its operation benign and useful, it must be exercised with great caution, and when necessity requires it, [2 *John. Ch. R.*, 378,] and one of the most essential prerequisites for a final injunction is that all persons interested in the subject matter and result should be made parties. [*See Wiser v. Blackly,* 1 *John. Ch. R.*, 438.] Chancellor Kent observed: "You must have before the court all whose interests the decree may touch, because they are concerned to resist the demand, and prevent the fund from being exhausted by collusion." The rule is so obviously proper that it needs no comment, nor to be supported by authority. In the case last referred to, it is stated that while such is the general rule, it is not of universal application, and cites some cases apparently relaxing the strict rule, but no one of them is, in any regard, an authority for dispensing with the necessity in this case of bringing before the court the several railroad companies who are made by the act in question, and are shown by the

petition to have a direct, positive, and very large interest in the decision of the question raised. If the act of the legislature is held valid, the several companies receive the proceeds of the sale of 500,000 acres of selected lands; if it is held invalid, they lose that much—more need hardly be said to show their interest. Yet the argument might be amplified by showing that the defendant in the suit has no interest in the decision. He is the custodian of the fund merely, and it is of no consequence to him whether he is to pay it to the railroad company or to the school fund. He, so far as interest is concerned, is entirely indifferent; and while he is properly made a party to the suit, he is only nominally a party, without any interest in defending or resisting the prosecution of the suit. The real persons interested in the resistance of the prayer of the petition, and the only ones, are the railroad companies, and, without their being in court, no final order could be made; and until they were made parties no order of any kind ought to be permitted. We think the court properly refused to grant the injunction on this ground.

There is another ground which would seem to be fatal, had it been insisted on in the proper way. The state is the plaintiff; yet no act of the legislature is found directing such a suit to be brought. On the contrary, any inference of the kind is negatived by the law of 1866, and the subsequent silence of the legislature on the subject. The attorney general, the law officer of the state, appears officially in this court to resist the prayer of the petition. So that we look in vain for any authority on the part of the state to institute such proceedings. It is true that in the affidavit made to the petition, the superintendent of public instruction states that he, as such officer, has charge of the school interests of

the state, and that the action is instituted at his instance to protect the said school interests of the state; but we fail to find any law confiding to that office any such duty either in express terms or by implication. The constitution confides the management and investment of the school fund to a board of which the superintendent is one, with no greater powers or responsibilities than either of the others. It may be gravely doubted whether in the absence of any legislation or the consent of the attorney general, any action can be maintained by the state. [See *State of Pennsylvania vs. Wheeling Bridge Co.*, 13 *Howard*, 515.] The state acts in her sovereign capacity, through the legislature, in making laws and directing her policy, and through her proper law officer in the protecting and enforcing her rights of property, and we see no authority anywhere for any other kind of suits. It is true that in many cases suits may be brought, or prosecutions initiated by individuals or officers in the name of the state, but in all such cases the state has expressly sanctioned such use of her name to secure private rights, or enforce public justice. But this inquiry is more curious than instructive, as the want of proper parties defendant, was sufficient cause to withhold the granting of the injunction. Such being in our view the law of the case, we are not permitted to inquire into the validity of the law of 1866. It would not only be against the plain decisions in such cases, but would shock the sense of common justice of mankind if a court should pass finally upon the merits of a question involving interests so direct and so vast, without the parties to be affected by the decision having had an opportunity to be heard in the court. In the language of Mr. Justice TREMBLE, delivering the opinion of the court in Malone vs. Hyde [12 *Wheaton*, 197,] "such a proceeding would

be contrary to all the rules which govern courts of equity and against the principles of natural justice;" and again, the learned judge observes: "We do not put this case upon the ground of jurisdiction, but upon a much broader ground, which must equally apply to all courts of equity, whatever may be their structure as to jurisdiction. We put it on the ground *that no court can* adjudicate directly upon a person's rights without the party being either actually or constructively before the court." Authorities without limit might be cited sustaining the same view, but it is not deemed necessary.

The case of the State, *ex rel.* Guthrie v. The Board of Commissioners [4 *Kan.*, 261] cited by the counsel for plaintiff, is not in point, for in that case the parties were before the court, and it was competent and proper for the court to give as many reasons as it chose for its decision, although, as was said in that case, one was sufficient.

The court recognizes the importance to all parties of having the question involved in this case speedily settled; nor is it unmindful of the magnitude of the interests involved, nor insensible of the advantages, so eloquently urged by counsel, to be derived from securing so magnificent a fund for the endowment of our schools, but all these benefits would be dearly bought, if they could only be had by breaking down fundamental principles of justice, which we believe would be done, were this court to pass directly upon the rights of parties not before it.

We conclude what is urged by counsel that it must be a bold hand that dares to pluck this golden fruit from the mouths of our children, but are conscious that the responsibility, whatever it may be, does not rest upon this court.

The decision of the court below must be affirmed.

All the justices concurring.