## STATE ex rel. *v.* LORD.*

[43 Pac. 471.]

1. INJUNCTION AT SUIT OF PRIVATE CITIZEN AGAINST PUBLIC OFFICERS.—A
private individual cannot have public officers enjoined from using
public funds unless some personal, civil, or property rights are being
invaded, or, in other words, unless such individual will be himself
injuriously affected by the proposed expenditure: *State* v. *Pennoyer,*
26 Or. 205, approved and followed.

2. INJUNCTION BY STATE AGAINST PUBLIC OFFICERS.—The state, when su-
ing in its corporate capacity for the protection of its property rights,
stands in no different or better position than an individual in respect
to an injunction against public officers: *White* v. *Commissioners of
Multnomah County,* 13 Or. 317; distinguished.

3. ACTION AGAINST PUBLIC OFFICIALS IN MATTERS OF PUBLIC CONCERN.—
In cases of purely public concern affecting the welfare of the whole
people or the state at large the action of a court can be invoked only
by such executive officers of the state as are by law intrusted with
the discharge of such duties.

4. INJUNCTION AGAINST OFFICIAL PERFORMING GOVERNMENTAL DUTIES.†—
The location of a site for a public institution, the purchase of a tract
of land therefor at that place, the employment of an architect to

*This case was originally before the supreme court as *State* v. *Pennoyer,* 26
Or. 205 (25 L. R. A. 862; 37 Pac. 906), before the present governor succeeded Syl-
vester Pennoyer. After reversal the newly installed state officers were substituted
as defendants for those who had retired, and the case proceeded under the pres-
ent title. The third opinion in the case will be found in 29 Or. ——.—REPORTER.

†For denial of injunction to restrain governmental or political action merely
because unconstitutional, see also *Fletcher* v. *Tuttle,* (Ill.), 25 L. R. A. 143, and
note; *State* v. *Pennoyer* (Or.), 25 L. R. A. 862; *Green* v. *Mills,* (Cir. Ct. App. 4th Cir.),
30 L. R. A. 90. But see also on the other hand *McCullough* v. *Brown,* (S. C.), 23 L.
R. A. 410, and *State* v. *Cunningham,* (Wis.), 17 L. R. A. 145.—REPORTER.

draw plans, etc., for the building, and the letting of contracts therefor by the governor, are matters governmental and executive in their nature, with which the courts cannot interfere by injunction; for it is now settled by a general consensus of authorities that in the execution of duties the performance of which requires the exercise of judgment or discretion, or in political or governmental matters pertaining to and affecting the welfare of the whole people, the executive is not subject to control by the courts. Nor is this rule in anywise changed by the fact that such duties have been delegated to a commission, of which the governor is a member.

5. INFORMATION BY ATTORNEY-GENERAL — PREROGATIVE WRIT.— The mere signature of the attorney-general or other public law officer, in his official capacity, to a complaint or bill shown to be that of a private relator, is not sufficient to impress it with the functions and capacity of an information competent to put in motion the machinery of the courts, whereby they will take cognizance of questions pertaining to the high prerogative powers of the state or affecting the whole people in their sovereign capacity.

6. CONSTITUTIONAL LAW — PRACTICE.— Courts will not pass upon constitutional questions unless they are necessary to the determination of a cause: *Elliott* v. *Oliver*, 22 Or. 47, approved and followed.

7. JURISDICTION OF EQUITY.— A court of equity will not assume to determine the constitutionality of a legislative act unless the case comes within some recognized ground of equity jurisdiction, and presents some actual or threatened infringement of the rights of property on account of such unconstitutional legislation.

APPEAL from Marion: H. H. HEWITT, Judge.

This is a suit to enjoin the defendants William P. Lord, H. R. Kincaid, and Philip Metschan, in their capacity as a state board of commissioners of public buildings, from carrying into effect certain acts of the legislative assembly providing for the construction of a branch asylum in the eastern portion of the state, and appropriating money therefor, because of the alleged unconstitutionality of the portions thereof locating such asylum in eastern Oregon. The amended complaint, omitting the caption and formal parts, alleges: "That the relator herein, A. C. Taylor, in connection with other citizens of the State of Oregon, is

a resident taxpayer within said state, and owns property within said state subject to taxation therein; that the defendants William P. Lord, H. R. Kincaid, and Philip Metschan are, in the order in which their names appear in this amended complaint, the Governor, Secretary of State, and State Treasurer of the State of Oregon, and as such constitute the board of commissioners of public buildings for said State of Oregon, and as such board are bound to expend large sums of the moneys of plaintiff, to be raised by taxation, for the purposes hereinafter more fully stated, which expenditures the plaintiff alleges are unlawful and repugnant to the organic law of the State of Oregon, namely: The members of said board, by virtue of the powers vested in them as such board, are about to expend large sums of money belonging to the plaintiff in the purchase of lands at some point east of the Cascade Mountains for the purpose of constructing what is alleged to be a branch asylum in the eastern portion of said state, as one of the public institutions of the state, which said acts of the defendants aforesaid they claim to exercise under and by virtue of a so-called act of the legislative assembly of the said state purporting to have been passed by said legislature at the seventeenth biennial session thereof, which said act was filed in the office of the secretary of state on the twenty-first day of February, eighteen hundred and ninety-three.

"That of the aforesaid moneys of the plaintiff said defendants propose to, and, unless restrained by this honorable court, will, expend of the moneys of the plaintiff then claimed to have been appropriated, and also subsequently appropriated by the eighteenth biennial session of said legislature, the sum of one hundred and sixty-five thousand dollars in the construction

of said buildings and fitting the same for use, and for lands on which to erect said buildings.

"That the said defendants, as such board, threaten to and are about to appoint three citizens of the State of Oregon, to be known as supervisors of the work of constructing such buildings, in some of the counties east of the Cascade Mountains, more than three hundred miles from the seat of government of said state, which said alleged supervisors are to have charge of the work of constructing such buildings on lands to be purchased and paid for by them of the moneys of the plaintiff, and threaten to and are about to direct said supervisors to expend large sums of money belonging to the plaintiff aforesaid in advertising for plans and specifications for such buildings, and are about to proceed to construct, in pursuance of said so-called act of said legislature aforesaid, a branch insane asylum and a public institution, together with outbuildings, excavations, and appurtenances thereto, which, in the judgment of said alleged supervisors, may be necessary, under the direction and supervisory control of the defendants hereinbefore named, and are about to expend of moneys of the plaintiff aforesaid the sum of one thousand five hundred dollars to the said so-called supervisors for their alleged services in the construction of said work.

"That the said defendants as such board propose to, and, unless restrained, will, if said buildings are permitted to be constructed and erected, employ a superintendent to conduct said institution at a salary of two thousand five hundred dollars per annum, and assistant physicians and attendants, all to be allowed the same compensation now fixed by law for like officers and attendants at the state insane asylum at Salem.

"That the said proposed expenditures of the plaintiff's moneys aforesaid, if permitted, would be contrary to law and the constitution of the State of Oregon, in that the said institution is not being constructed at the seat of government of the said state, but more than three hundred miles therefrom; that the expenditures extend to the equipping, furnishing, officering, and maintaining the same, and will greatly increase the burden of taxation, and require the expenditure of one hundred thousand dollars more than would be necessary to expend in the construction of like buildings at the seat of government.

"And the plaintiff further alleges that the annual cost of maintaining the same after it is equipped and ready for use will be fifty thousand dollars per annum more than would be necessary to be expended in maintaining like services for the unfortunate insane of said state, if the same facilities are provided therefor in connection with the institution now in operation at the seat of government.

"That, unless restrained by this honorable court, the defendants will purchase and pay for the lands aforesaid, contract therefor, and build and pay for said building, appoint the supervisors and employ superintendents, physicians, and attendants, upon salaries as aforesaid, all to be paid out of the public funds of the State of Oregon, raised by taxation, thereby greatly increasing plaintiff's burden of taxation, to the great and irreparable injury of plaintiff; that plaintiff has no plain, speedy, or adequate remedy at law for the redress of the grievances herein complained of.

"Wherefore, plaintiff prays that an injunction may issue restraining the defendants and their agents, servants, and attorneys from using the moneys of the plaintiff for any of the purposes which they propose,

as specified in the complaint, and that on final hearing said injunction be made perpetual, and for such further order or relief as may be meet with equity, and also for costs and disbursements. James McCain, district attorney for the third judicial district. H. J. Bigger and W. H. Holmes, attorneys for plaintiff.

"State of Oregon, County of Marion, ss. I, A. C Taylor, being first duly sworn, say that I am the person commencing the above action as relator for and in behalf of the State of Oregon; that I have read the foregoing complaint, and know the contents thereof; that I believe said complaint to be true. A. C. Taylor. Subscribed and sworn to before me this second day of March eighteen hundred and ninety-five. (Seal.) Webster Holmes, Notary Public for Oregon." The defendants demurred to the complaint upon the ground that it does not state facts sufficient to constitute a cause of suit, which demurrer was overruled and the defendants answered. A trial was had upon the issues thus joined, resulting in a decree in accordance with the prayer of the complaint, from which defendants appeal.                                      REVERSED.

For appellant there were oral arguments by *Messrs. William P. Lord, in pro. per.,* and *Julius C. Moreland,* with a brief by *Messrs. Moreland* and *George G. Bingham,* to this effect.

An injunction will not lie to control the action or discretion of the executive. This is an extraordinary proceeding. The power of the state is invoked to restrain the executive officers of the state from carrying out a plain enactment of the legislature. And this not because they are invading any private right of the complainant, but because he alleges such action

would increase in some infinitesimal degree his taxes. The constitution divides the government into three branches, executive, legislative, and judicial. Each one of these departments is as much bound by the mandates of the constitution as the other. The executive takes as solemn an oath to support the constitution as do the judges. He has quite as much right to interpret the constitution as has any other person. He must interpret the law, and being a coördinate branch of the government, his office created by the same instrument that created this court, his interpretation must be final. The granting of an injunction carries with it the idea of the power to punish for contempt in case of disobedience. While such an occasion will not arise in this case, the decision in this cause will form a precedent, and should be made with this end in view: *People* v. *The Governor*, 29 Mich. 320 (18 Am. Rep. 89); *State* v. *Towns*, 8 Ga. 372; *People* v. *Bissell*, 19 Ill. 233 (68 Am. Dec. 591); *People* v. *Yates*, 40 Ill. 126; *State* v. *Warmoth*, 22 La. Ann. 1 (2 Am. Rep. 712); *Re Dennett*, 32 Me. 508 (54 Am. Dec. 602); *Re Inquiries submitted by Governor*, 58 Mo. 369; *State* v. *The Governor*, 25 N. J. Law, 331; *Jonesboro, Fall Branch, and Blair's Gap Turnpike Company* v. *Brown*, 8 Baxt. 490; *Hawkins* v. *The Governor*, 1 Ark. 570 (33 Am. Dec. 346); *State* v. *Kirkwood*, 14 Iowa, 162.

The president of the United States cannot be restrained by injunction from carrying into effect an act of congress alleged to be unconstitutional, nor will a bill having such a purpose be allowed to be filed: *Mississippi* v. *Johnson*, 71 U. S. (4 Wall.), 475 (18 L. ed. 437.) And it is confidently believed that no case can be found where an executive has ever been enjoined from carrying out a law regularly passed by the legislature.

The court will not grant an injunction, unless the plaintiff proves that he will be damaged. Specula-

tion will not answer the demands of the law: *Gibbs* v. *Green,* 54 Miss. 612; *Tongue* v. *Gaston,* 10 Or. 328; *State* v. *Pennoyer,* 26 Or. 205 (25 L. R. A. 862); *Esson* v. *Wattier,* 25 Or. 75.

Contemporaneous construction of a constitutional provision is always a persuasive authority. When an act of the legislature has long been recognized as binding, and when important affairs of the community affecting individual rights have been transacted in accordance with its provisions, it should not be disturbed, unless it plainly and unequivocally conflicts with the organic law: *Crawford* v. *Beard,* 12 Or. 452; Endlich on Interpretation of Statutes, § 527; *Stuart* v. *Laird,* 5 U. S. (1 Cranch), 299 (2 L. ed. 115); Cooley on Constitutional Limitations, pp. 82, 81; *Kelly* v. *Multnomah County,* 18 Or. 359; *Mitchell* v. *Campbell,* 19 Or. 198; *People* v. *La Salle County Supervisors,* 100 Ill. 504; *Moers* v. *Reading,* 21 Pa. 188; *Johnson* v. *Joliet and Chicago Railroad Company,* 23 Ill. 207; *People* v. *Dayton,* 55 N. Y. 377; *Rogers* v. *Goodwin,* 2 Mass. 478.

For respondent there was an oral argument by *Mr. H. J. Bigger,* with a brief by *Messrs. Bigger, James McCain,* district attorney, and *William H. Holmes* urging these points.

The appellants are acting without authority of law, and in violation of the constitution of the State of Oregon, and may be enjoined like other corporate officers from wasting public funds in doing that which the law gives them no authority to do, or for proceeding in a manner contrary to that prescribed by law: *Carman* v. *Woodruff,* 10 Or. 135; *White* v. *Multnomah County Commissioners,* 3 Or. 317 (57 Am. Rep. 20); *Wormington* v. *Pierce,* 22 Or. 606; *Baker* v. *Payne,* 22 Or. 335;

*Rice* v. *Smith,* 9 Iowa, 270; *Drake* v. *Phillips,* 40 Ill. 388; *Colton* v. *Hanchett,* 13 Ill. 615; *Webster* v. *Harwinton,* 32 Conn. 131; *Portland and Willamette Valley Railway Company* v. *Portland,* 14 Or. 188 (58 Am. Rep. 299).

The relator need not be the real party, or have any special interest to enforce a public right, but as a voter and citizen he has a general interest in the execution of the law: *State* v. *Ware,* 13 Or. 380. The same rule applies in this case as in an application for mandamus. The relator need show no further interest than that of a citizen interested in having the law enforced or observed, or an unlawful act enjoined: *Pike County Commissioners* v. *People,* 11 Ill. 208; *Hall* v. *People,* 57 Ill. 307; *Glencoe* v. *People,* 78 Ill. 383; *People* v. *Pacheco,* 29 Cal. 212; *Linden* v. *Alameda County Supervisors,* 45 Cal. 7; *Sanger* v. *Kennebec County Commissioners,* 25 Me. 291; *Heffner* v. *Commissioners,* 28 Pa. 108; *People* v. *Regents of University of Michigan,* 4 Mich. 98.

Injunction is the proper, in fact the only, remedy, as the appellants have acted, and purpose and threaten to act, in violation of the constitution and the rights of the people, who have only the remedy of injunction: *State* v. *Judge of Seventh Judicial District Court,* 42 La. Ann. 1104; *Bradley* v. *Powell County Commissioners,* 2 Humph. 428; *Ford* v. *Farmer,* 9 Humph. 157; *Bridgenor* v. *Rodgers,* 1 Coldw. 259; *Marion County* v. *Grundy County,* 5 Sneed, 490; Hilliard on Injunctions, 443; High on Injunctions, §§ 1308, 1319, 1321, 1327.

The inquiry primarily is, is the act sought to be restrained by the injunction one which is purely ministerial; or does it partake of any element of judgment or discretion upon the part of the governor? *Pennoyer* v. *McConnaughy,* 140 U. S. 1 (35 L. ed. 363); *State* v. *Chase,* 5 Ohio St. 528; *Tennessee and Coosa Railroad Company* v. *Moore,* 36 Ala. 371; *Cotton* v. *Ellis,* 7 Jones' L.

545; *State* v. *Police Jury,* 39 La. Ann. 759; *Groome* v. *Gwinn,*
43 Md. 572; *Middleton* v. *Low,* 30 Cal. 597; *Gray* v. *State,* 72
Ind. 567; *Harpending* v. *Haight,* 39 Cal. 189 (2 Am. Rep.
432); *Mott* v. *Pennsylvania Railway Company,* 30 Pa. St. 9 (72
Am. Dec. 664); *State* v. *Kirkwood,* 14 Iowa, 162; *State* v.
*Blasdel,* 4 Nev. 241; *State* v. *Whitesides,* 30 S. C. 579 (3
L. R. A. 777); *Greenwood Cemetery Land Company* v. *Routt,*
17 Colo. 156 (15 L. R. A. 369); Mechem on Public Of-
ficers, § 954 *et seq.*; Moses on Mandamus, 80.    Counsel
for appellants has failed to distinguish between the
governor of the state acting in his executive capacity,
and his acting in a clerical capacity in the discharge
of some duty cast upon him by an act of the legisla-
ture: *Pennoyer* v. *McConnaughy,* 140 U. S. 1 (35 L. ed. 363).

Opinion by MR. JUSTICE WOLVERTON.

1.    When this case was here before (*State* v. *Pen-
noyer,* 26 Or. 205; 25 L. R. A. 862; 37 Pac. 906), we held
that a private individual could not have public officers
enjoined from using public funds unless it could be
shown that some civil or property rights were being
invaded, or, in other words, that the individual was
going to get hurt by the transaction.    Upon that prin-
ciple it was decided that he should be required to
show that the location and building of the branch asy-
lum in eastern Oregon would be attended with greater
cost and expense than if constructed at the capital,
thereby increasing the burden of taxation which would
be imposed upon him, with others whose duty it is to
contribute to the support of the government.

2.    It was also held that the state, suing in its
corporate capacity for the protection of its property
rights, stood in no different or better position in this
regard than an individual.    This doctrine is supported

by high authority. ALLEN, J., in *People* v. *Canal Board*. 55 N. Y. 395, says: "When the state as plaintiff invokes the aid of a court of equity, it is not exempt from the rules applicable to ordinary suitors; that is, it must establish a case of equitable cognizance, and a right to the peculiar relief demanded." And, as is said by the same eminent jurist in *People* v. *Ingersoll*, 58 N. Y. 14 (17 Am. Rep. 178), "A distinction is to be observed between actions by the people or the state in right of the prerogative incident to sovereignty, and those founded upon some pecuniary interest or proprietary right. The latter are governed by the ordinary rules of law by which rights are determined between individuals." To the same effect is the doctrine announced in *People* v. *Fields*, 58 N. Y. 614. See also 2 High on Injunctions, § 1327. So that we then concluded the plaintiff herein occupied no better or superior position, from a legal standpoint, for enforcing the remedy sought to be invoked than the plaintiff in *Sherman* v. *Bellows*, 24 Or. 553 (34 Pac. 549). From this position we see no sufficient reason for receding, as we believe it to be in sound law, and supported upon reason and authority. It is insisted that the decision in *White* v. *Commissioners*, 13 Or. 317 (58 Am. Rep. 20, 13 Pac. 484), stands in the way of this position, but we do not think so. White had a private interest to subserve in bringing the suit. The increase of the burden of taxation consequent upon maintaining the machinery necessary to secure a registration of voters under the law was sufficient to give him a standing in court to restrain the invasion of a private right: See *Fletcher* v. *Tuttle* and *Blair* v. *Hinrichsen*, 151 Ill. 41 (25 L. R. A. 143; 37 N. E. 683). But the question touching the power of the court to interfere by injunction in restraint of the action of the county commissioners

was not mooted at the hearing, and was not a point in controversy, although jurisdiction was necessarily assumed before the ultimate question in the case could have been decided. So the case is not in point, nor is it controlling here.

It is stoutly contended that it is shown by the evidence taken and submitted that the relator will be damnified by reason of the location and construction of the branch asylum at the town of Union, under the rule above established. We have carefully examined all the testimony found in the record, and are unable to concur with this view. The whole theory of the relator, by which he seeks to establish injury, is based upon the assumption that the legislative and executive departments of the state will, in the event that the location and construction of the branch asylum is restrained, provide ways and means for the construction of such institution upon what is known as the "Cottage Farm," a tract of land now belonging to the state, and situate some six miles from the capital, and thereby prevent the necessity of purchasing and acquiring other lands upon which to establish and construct such buildings; that they will utilize in connection therewith certain outbuildings now in use by the state, and save the expense of constructing other like buildings; and that, by reason of the proximity of such location to the present state asylum, they could dispense with the cost of an additional superintendent, and some additional physicans and assistants. But who can say that the legislature would be content to build the branch asylum at the Cottage Farm, or that it would see fit to utilize the outbuildings now in use in connection therewith, or that it would not in any event provide for the employment of an additional

superintendent, and other physicians and assistants? The matter is of such vital and public concern, and attended with such diverse and dependent circumstances, and so wholly and peculiarly within the province of the legislature to devise the ways and means, that it would be but a conjecture at best to attempt to determine in advance the result of its deliberations in this respect. If the conditions assumed were established, then the question might possibly be capable of demonstration; but where the establishment of these conditions is first left to a body with discretionary powers, the ultimate question for the court to pass upon becomes speculative, and too remote for practical solution and determination. So we are constrained to pass the point without further comment touching the evidence submitted.

3. But it is now contended for the first time that this is a suit by the state in the right of prerogative incident to sovereignty; that it was instituted by the law officer of the state in the interest of the whole people, and being so instituted, the high prerogative powers of government are set in motion, and that the courts of appropriate jurisdiction will take cognizance to control the officers of state from acting in violation of duties imposed upon them by law, and more especially where they sustain trust relations to the whole people, — not in the sense that a public office is a public trust, but as it pertains to the public funds of the people, raised by taxation, and intrusted to their management and control under the laws of the state. Under the common law suit was instituted in behalf of the Crown, or of those who partook of its prerogative, by the attorney-general, who made his complaint to the court purely by way of information. A private

person having cause to complain in a court of equity proceeded by written statement of his cause, which was called a "bill in chancery." In all cases of suits which immediately concerned the rights of the Crown, its officers proceeded upon their own authority, with-out the intervention of any other person; but where the suit did not immediately concern the rights of the Crown, they generally depended upon the relation of some person whose name was inserted in the informa-tion, and who was called the "relator." It sometimes happened that the relator had an individual interest in the matter in dispute, as where he was entitled to compensation for an injury. In such a case his per-sonal complaint was joined to and incorporated with the information given to the court by the Crown offi-cer; these together comprised what is known and termed as "an information and bill." It was the gen-eral practice, where suits immediately concerned the right of the Crown, for the Crown officers to proceed without a relator; yet by reason of a prerogative of the Crown not to pay costs to a subject except in certain cases, sometimes, through the tenderness of the officers toward the defendant, the interposition of a relator was required, against whom the costs were taxed in case it appeared that the suit was improperly instituted or prosecuted. The introduction of a re-lator was a mere act of favor on the part of the Crown and its officers: Story's Equity Pleadings, (9th ed.) §§ 7, 8; 1 Daniel's Chancery Practice, 2, 3, 7, 11, 12; *State ex rel.* v. *Dayton Railroad Company,* 36 Ohio St. 434; *Attorney-General* v. *Delaware Railroad Company,* 27 N. J. Eq. 631. In *Attorney-General* v. *Mayor of Dublin,* 1 Bligh, 312, Lord REDESDALE says: "The relator is introduced properly by the attorney-general, that there may be some person responsible for the costs of the proceed-

ings, if finally there should be an opinion in the
court that the information has been improperly insti-
tuted, or if in the proceedings it should be in any
manner improperly conducted. It is for the benefit of
the subject that the attorney-general in all those pro-
ceedings provides persons to be responsible as re-
lators in the information, that the court may award
against them what the court cannot do against him."
So that the relator, where the proceeding immediately
concerned the rights of the Crown, except so far as
to stand sponsor for costs in case the Crown officers
were unsuccessful in the suit, had no personal right
or authority to become a party to the proceeding,
either by relation or otherwise. It was only in cases
where he had some private or individual interest to
subserve, either in conjunction with the rights of the
Crown, or wherein it was the province of the Crown
to protect the rights of its subjects, acquired from it
by grant or otherwise, that he could, as a matter of
right, interpose as a relator through the attorney-
general to set in motion the machinery of the court.
The case stands different in mandamus proceedings.
There a private person may, in behalf of the public,
and without showing any individual or special inter-
est to be subserved, become a relator, and, through
the proper state officer, institute the proceeding. Al-
though the authorities are much divided, it is settled
in this state that "where the question is one of pub-
lic right, and the object of the mandamus is to pro-
cure the enforcement of a public duty, the people are
regarded as the real party, and the relator, at whose
instigation the proceedings are instituted, need not
show that he has any legal or special interest in the
result, it being sufficient to show that he is a citizen,
and as such is interested in the execution of the

law": *State* v. *Ware,* 13 Or. 383 (10 Pac. 885); High on Extraordinary Legal Remedies, § 431. But in equitable proceedings, where the immediate rights of the Crown were alone concerned, we have seen that the attorney-general only could invoke the action of the courts through tne instrumentality of an information, and if a relator was made a party, it was at his discretion, that there be some one to stand responsible for the costs, the relator as of right, having no interest in the proceeding, and no power nor authority to direct or control the suit in any particular whatever.

The attorney-general could, at common law, by information in chancery, enforce trusts, prevent public nuisances, and the abuse of trust powers: *People* v. *Miner,* 2 Lans. 396. His supervision, through equitable instrumentalities, of public trusts, and his authority to prevent the abuse of trust powers public in their nature, was apparently the outgrowth of equitable interposition regarding charitable uses. It was formerly held that it was the source from which the funds were derived, and not the purpose for which they were dedicated, that constituted the use charitable: *Attorney-General* v. *Heelis,* 2 Sim. and Stu. 77. But subsequently it was settled that the purpose to which the funds were dedicated was the real criterion by which the charitable use was to be determined. And this enlargement of the principle governing charitable uses extended equitable jurisdiction to public trusts involving all funds raised by taxation or otherwise for public purposes: *Attorney-General* v. *Brown,* 1 Swanst. 265; *Attorney-General* v. *Mayor of Dublin,* 1 Bligh (N. S.), 312; *Attorney-General* v. *Eastlake,* 45 Eng. Ch. 218–221. In the latter case it was declared that the attorney-general was the proper person to represent those who

28 OR.—36.

were interested in having these public funds faithfully applied to the general and public purposes for which they were provided and intended. ALLEN, J., in *People v. Ingersoll*, 58 N. Y. 14, says: "It is well settled in England that, in right of the prerogative of the Crown, the attorney-general, in his name of office, may proceed, either by information or bill in equity, to establish and enforce the execution of trusts of property by public corporations, to prevent the misappropriation or misapplication of funds or property raised or held for public use; and the abuse of power by the governors of corporations or public officers, or the exercise of powers not conferred by law, and, generally, to call upon the courts to see that right is done the subjects of the Crown who are incompetent to act for themselves. Ordinarily, the remedies sought have been preventive, but in some cases, as incident to the preventive and prospective relief, a claim has been made for retrospective relief, especially when the misappropriated funds could be traced and reclaimed in specie. The jurisdiction has been sustained upon the general principles of the right and duty of the court to grant preventive relief, and the relief actually granted, if any, in addition and as incident to that, has depended upon circumstances." But in all cases the court's action was invoked against faithless trustees to compel a proper execution of the trust, and the right use of trust funds, at the hands of those charged with its administration. A breach or violation of public, duty enjoined upon those with whom the trust and the execution thereof is confided or committed, either actual or threatened or impending, is at the foundation of every action by the attorney-general or of the Crown, or the people as sovereign, and essential to the right of either to maintain, as

well as the right of a court of equity to entertain jurisdiction of, a suit by either touching property or funds held by public or municipal corporations for public use. These principles thus established in England have been affirmed to some extent by the courts of this country and applied in like cases. In *People* v. *Ingersoll,* 58 N. Y. 14, it is further said: "Doubtless, the prerogatives of the Crown, except as affected by constitutional limitations, exist in the people as sovereign, but to what extent the exercise of this prerogative is committed to the public officials, either by the legislature or the common law, is a question worthy of grave consideration, and not to be lightly decided, and should only be determined when necessary to a judgment and decision. * * * If there were no other remedy for a great wrong, and public justice and individual rights were likely to suffer for want of a prosecutor capable of pursuing the wrongdoer and redressing the wrong, the courts would struggle hard to find authority for the attorney-general to intervene in the name of the people." The doctrine is broadly asserted in Missouri, where it is held that it is competent for the state, through its authorized officers, to proceed in equity in restraint of public corporations doing acts in violation of the constitution and laws of the state: *State* v. *Saline County Court,* 51 Mo. 350. But the case made was for a misappropriation of public funds in subscriptions to a railroad company, which funds were to be raised by assessment and taxation of the people of Saline County. So that the case is authoritative only upon the power of a court of equity through its injunctive process to restrain public officers in the misapplication and misappropriation of public funds, instituted at the instance of the executive or law officers of the state. The decision is,

however, based to a large extent upon a statute providing that "The remedy by writ of injunction or prohibition shall exist in all cases where an injury to real or personal property is threatened, and to prevent the doing of any legal wrong whatever, whenever, in the opinion of the court, an adequate remedy cannot be afforded by an action for damages:" 2 Wagner's Statutes, p. 1032. BLISS, J., in that case admits that he found some difficulty in regard to the question whether injunction would lie at all, but concludes that both upon reason and authority "where the wrong is a public one, suit may be brought in the name of the state, by its proper representative, and that under our statute that representative is the circuit attorney." See also *State ex rel* v. *Dayton Railroad Company,* 36 Ohio St. 434; *State* v. *Curators of State University,* 57 Mo. 178; *State* v. *McLaughlin,* 15 Kan. 228.

The Wisconsin cases, though not authority here, serve to illustrate the question touching sovereignty and prerogative appurtenant thereto, and the use of the extraordinary remedy by injunction, when it is invoked in the service of a sovereign state and in the interest of the whole people, as distinguished from its ordinary use, or coupled with ordinary equitable proceedings. It may be said here that injunction, in itself, is not prerogative or jurisdictional. It was issued in cases where the court had jurisdiction otherwise as preliminary or interlocutory to the final decree, or to give effect and permanency to such a decree. It was remedial and in aid of jurisdiction already attached within the vast range of equitable cognizance. Not so with mandamus, habeas corpus, and quo warranto, they were common law prerogative writs, which "appertain to and are peculiarly the instruments of the sovereign power, acting through its appropriate

department; prerogatives of sovereignty, represented in England by the king, and in this country by the people in their corporate character, or in other words, the state": *Attorney-General* v. *Blossom,* 1 Wis. 278. It has been said that injunction and mandamus are correlative in their operation; that where one commands the other forbids; that where there is nonfeasance, mandamus compels the duty, and, where there is malfeasance, injunction will restrain. But this is so in manner only. Injunction is frequently mandatory, and mandamus sometimes operates as a restraint. Aside from this, the injunctive writ, not being jurisdictional but remedial in its operation, a case of well established equitable cognizance must be presented before its use and adaptation would become appropriate, and it is not every restraint which may seem beneficial as a remedy that the writ will enforce. For instance, some civil or private right must be about to be invaded, or some matter of public trust or concern of which equity takes cognizance must be deleteriously involved or affected, before injunction can be brought into requisition. So that it is apparent that it is not every case wherein mandamus will command that injunction will, in contrast, restrain. By reason of a provision in the Wisconsin Constitution conferring original jurisdiction upon the supreme court "to issue writs of habeas corpus, mandamus, injunction, quo warranto, certiorari, and other original and remedial writs, and to hear and determine the same," it has been there held that injunction is a *quasi* prerogative writ, and founds jurisdiction as if it were an original writ, whenever a question arises appropriate to its use, which "should be a question *quod ad statum republicae pertinet,* one 'affecting the sovereignty of the state, its franchises, or prerogatives, or the liberties of its people'":

*Attorney-General* v. *Chicago and Northwestern Railway Company,*
35 Wis. 513; *Attorney-General* v. *City of Eau Claire,* 37 Wis.
425; *State* v. *Cunningham,* 81 Wis. 440 (15 L. R. A. 561,
51 N. W. 724). Notwithstanding this constitutional
provision, the earlier cases sought for equitable
grouds in support of the injunctive writ. For instance,
in *Attorney-General* v. *Chicago and Northwestern Railway Com-
pany,* 35 Wis. 513, it was argued that courts of equity
have no jurisdiction, at the suit of the attorney-gen-
eral, to enjoin usurpation, excess, or abuse of corpor-
ate franchise. The court, after a careful review of the
authorities both English and American, concluded that
the jurisdiction exists in this country as well as in
England, and says: "The equitable jurisdiction by in-
junction goes upon the ground of nuisance. As, in-
deed, any intrusion upon public right is in the realm
of purpresture. The ancient jurisdiction to restrain
nuisance is, perhaps, the most direct ground of the
modern jurisdiction under consideration. And the
former is fully asserted as an American jurisdiction,
as to remedies both by private persons and by the
attorney-general for the public," citing 2 Redfield on
Railways, 307, and 2 Story's Equity, §§ 720, 723. And
so in *Attorney-General* v. *City of Eau Claire,* 37 Wis. 425,
which involved the damming of a public river by the
City of Eau Claire, the court, considering such an en-
croachment as a purpresture, and within equitable jur-
isdiction to enjoin, and as it concerned the sovereign
prerogative of the state and the prerogative jurisdic-
tion of the supreme court, declared it to be a fit case
for the exercise of its original jurisdiction by the in-
junctive writ. But in *State* v. *Cunningham,* 81 Wis. 440,
15 L. R. A. 561, 51 N. W. 724,) which was a later case
involving the constitutionality of the act of apportion-
ment of the state into senatorial and assembly dis-

tricts, the court placed its jurisdiction, as it had inti-
mated might be done in *Attorney-General* v. *Chicago and
Northwestern Railway Company,* upon the single ground
that the constitution had adapted the writ of injunc-
tion to prerogative uses.

PINNEY, J., says: "It may well be conceded that
courts of equity would not, by reason of their original
jurisdiction, have authority to interfere by injunction
in a case such as this; but it is to be borne in mind
that the writ of injunction, under our constitution, is
put to prerogative uses of a strictly judicial nature,
as a remedy of a preventive character in case of
threatened public wrong to the soverignty of the
state, and affecting its prerogatives and franchises
and the liberties of the people; their rights being
protected in this court by information in the name of
the state, on relation of the attorney-general." The
learned judge spoke advisedly when he said "it may
well be conceded that courts of equity would not, by
reason of their original jurisdiction, have authority
to interfere by injunction" in such a case, as indeed
there is high authority in support of the concession.
*Fletcher* v. *Tuttle* and *Blair* v. *Hinrichsen,* 151 Ill. 41, (25
L. R. A. 143, 37 N. E. 683,) are cases involving similar
questions arising out of the passage of an act to ap-
portion the State of Illinois into senatorial districts,
claimed to be unconstitutional and void; but the suits
were instituted by private individuals, and it was
there decided that wherever the established distinc-
tions between equitable and common law jurisdiction
are observed, courts of equity have no authority or
jurisdiction to interpose for the protection of rights
which are merely political, and where no civil or
property right is involved. In all such cases the
remedy, if there is one, must be sought in a court of

law, and the case of *State* v. *Cunningham,* in Wisconsin,
is distinguished. Doctrine of similar import is laid
down by Chief Justice FULLER in *Green* v. *Mills,* 16 Cir.
Ct. App. 516 (69 Fed. 852, 30 L. R. A. 90) a very re-
cent and well considered case. But whatever the true
doctrine might be as to the right use of the injunct-
ive writ in cases involving merely political rights,
the question is not involved here. These cases oper-
ate, however, as powerful factors in determining equi-
table jurisdiction, and fixing the right use of the in-
junctive writ. Under the Wisconsin Constitution, in-
junction being held to be a *quasi* prerogative writ, its
operation becomes correlative with the common law
writ of mandamus, and will lie to restrain excess in
the same class of cases that mandamus supplies de-
fect, the use of the one writ or the other in each
case turning solely on the accident of over-action or
shortcoming of the defendant. But not so where the
distinction between the equitable and common law
jurisdiction is still observed, as it is in this state.
Hence, if jurisdiction to issue the injunctive writ is to
be entertained, it must be based upon some well de-
fined equitable grounds to support it. We have seen,
however, that in England the equitable jurisdiction to
enforce trusts, prevent public nuisances, and the
abuse of trust powers, was invoked for prerogative
purposes. Whenever necessary and appropriate in-
junction was issued in aid of the jurisdiction, and be-
came effective in its exercise. While the writ of in-
junction is not in itself a prerogative writ, it is put
to prerogative purposes when used in aid of equita-
ble jurisdiction invoked for such purposes. We have
also seen that in this country the jurisdiction and the
writ may be called into requisition for like purposes.
Now, when so called into requsition, in cases appro-

priate for its adoption and use, is there any reason why the remedy thus invoked is not as effective for the accomplishment of like high purposes as the *quasi* prerogative writ peculiar to the state of Wisconsin under her constitution? We think that none exists. So, therefore, the lawfully constituted authorities are not without an appropriate remedy in a case where public officials are proceeding in derogation of law, in the application and use of public funds, wherever special injury cannot be predicated. The sovereign state, the whole people, have a right to see that the laws are duly executed. In most cases the common law prerogative writs are appropriate for the accomplishment of such ends. Whether appropriately denominated "prerogative" in the states of the Union, it differs but little, they emanate from a like high source, pertain to sovereignty, and are adapted to like uses and purposes. But wherever it is necessary to prevent the abuse of trust powers, and the misapplication of trust or public funds, the equitable remedy is likewise appropriate, and likewise emanates from the like high source, and is attended with equivalent attributes of power. See *People* v. *Ingersoll,* 58 N. Y. 14 and *State* v. *Saline County Court,* 51 Mo. 350. But the rule and the doctrine upon which it is based has its limitations. It is not every class of public officers that may be controlled in any event at the hands of the judiciary. This will become apparent in the further development of the opinion.

4. We have here to deal with matters not political, but with matters *publici juris,* and with the acts of public officers touching the administration of public funds, and affecting the whole people, or the state at

28 OR.—37.

large. And the question comes to this, whether the governor, the executive officer of the state, can be enjoined while in the discharge of official duties? We speak of the governor, as it is in effect the acts of the governor which this proceeding is intended to interdict. True, the act providing for the construction of a branch asylum at Union, and appropriating funds therefor, has empowered the board of commissioners of public buildings of the State of Oregon, consisting of the governor, secretary of state, and treasurer, to superintend the construction thereof; but, in the absence of such a commission, it would be the duty of the governor to see that the law was carried into effect; so that, whether the duty is performed by the governor, or by a commission named by the legislature, of which he is a constituent part, and empowered to perform the service, the rules of law touching the interference of the courts with the performance of such duty must be the same, whether required to be performed by the one or the other. The purpose of the legislature was to construct and equip more commodious buildings and apartments for the accommodation of the insane and idiotic of the state. To provide for and take care of this unfortunate class of individuals, both for their own good and protection, as well as for the protection and security of all citizens, is a matter purely of public concern, as it relates to the welfare of the whole people. The subject is one of governmental concern only, and relates entirely to the legislative and governmental departments of state. In pursuance of this purpose, the acts involved here were passed and became law by the approval of the governor. That the legislature had the undoubted right to determine upon the necessity for such additional buildings, and the amount of funds necessary

for their construction and equipment, as we have said
in our former opinion, no one can dispute.   Further-
more, it was entirely within its coördinate powers to
pass an act locating the branch asylum in the eastern
part of the state, and no power vesting in the govern-
ment could prevent it from so doing, and yet its va-
lidity would be determined by the fundamental law,
when properly invoked.   The governor could prevent
its becoming a law by the exercise of the veto power
confided to him; but, as above stated, the measure be-
came a law by the approval of the executive.   It is
the duty of the governor to see that all the laws are
faithfully executed, and it is now proposed to execute
this law.   The judicial department is called upon to
prevent its execution.   Is it competent for it to inter-
pose in this proceeding, and restrain the executive
department of the state?   It may well be admitted
that if the duty pertained to acts which are merely
ministerial in their character, which call for no exer-
cise of judgment or discretion, and do not relate to
political or governmental matters, the governor of the
state may, at the suit of interested parties, in a pro-
ceeding appropriate for the purpose, be compelled at
the hands of the judiciary to perform them: *Greenwood
Cemetery Land Company* v. *Routt,* 17 Colo. 156 (15 L. R. A.
369, 28 Pac. 1125); *Gaines* v. *Thompson,* 74 U. S. (7 Wall.),
347; Moses on Mandamus, 80; *Enterprise Savings Associa-
tion* v. *Zumstein,* 15 Cir. Ct. App. 153 (67 Fed. 1000);
*Board of Liquidation* v. *McComb,* 92 U. S. 541.   But if it
pertains to duties which require the exercise of judg-
ment or discretion to perform, or to matters political
or governmental in their nature, all the authorities
agree that the executive is clearly independent of the
other coördinate departments of government, and is
not subject in any manner to their direct supervis-

ion or control. Chief Justice TANEY, in *Mississippi* v. *Johnson*, 71 U. S. (4 Wall.), 498, says: "A ministerial duty, the performance of which may, in proper cases, be required of the head of a department, by judicial process, is one in respect to which nothing is left to discretion. It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law."

This definition of a ministerial duty is concurred in by Mr. Justice MILLER in *Gaines* v. *Thompson*, 74 U. S. (7 Wall.), 347. Now, what is the nature of the duties cast upon the governor by these acts? are they purely ministerial or do they belong to the domain of governmental affairs? What is he, or the board of which he is a member required to do? This latter question answered, the former is answered also without the necessity of comment. He shall, within sixty days, locate a site for a branch insane asylum at some point in one of the counties named lying in the eastern part of the state; he shall contract for and purchase a tract of land at the place selected; he shall hire a competent architect, who shall, under the direction of the board, draw plans, prepare specifications, etc. When these are completed the board shall approve, and thereupon shall give notice, and in due time let contracts, etc. In all these prescribed duties there is not a single item that partakes of a ministerial character. They all pertain to executive duties, and are wholly and entirely governmental in their nature and purport. The governor can execute them or not at his will, as they fall exclusively within his department of government. To test the question as to whether these enumerated duties are ministerial or governmental, suppose these acts of the legislature were entirely free from doubt touching their constitutional validity, and the governor,

or the board acting in his aid, should refuse to exe-
cute the requirements thereof, would this court by a
mandamus proceeding compel him to act? Undoubt-
edly not, and why? Because the acts required of him
do not fall within the domain of those acts which are
denominated "ministerial." On the contrary, they are
governmental in their nature, pertain to matters *publici
juris,* and affect the welfare of the people at large.
Now, for the sake of the argument, concede that the
law is unconstitutional, and that injunction is an ap-
propriate remedy, and is competent to restrain where
mandamus will compel; could this court with any more
propriety or right interfere with the governmental and
executive acts of the governor? No one will so con-
tend. Chief Justice MARSHALL, in *Marbury* v. *Madison,*
5 U. S. (1 Cranch), 170, says: "It is not by the office
of the person to whom the writ is directed, but the
nature of the thing to be done, that the propriety or
impropriety of issuing a mandamus is to be deter-
mined." In *Sutherland* v. *The Governor,* 29 Mich. 230, (18
Am. Rep. 89,) Judge COOLEY says: "In many cases
it is unquestionable that the head of an executive de-
partment may be required by judicial process to per-
form a legal duty, while in other cases, in our judg-
ment, the courts would be entirely without jurisdic-
tion; and, as regards such an officer, we should con-
cede that the nature of the case and of the duty to be
performed must determine the right of the court to
interfere in each particular instance." So that, look-
ing to the nature of the thing to be done and the
duty to be performed by the governor under the re-
quirements of these acts, there can be but one conclu-
sion in respect to them. Whatever else may be said,
they are not ministerial, and hence no judicial process
of the courts can issue to compel or restrain, or in

any manner affect or interfere with, the executive voli-
tion of the governor with respect thereto. The mere
fact that a law is alleged to be unconstitutional does
not confer jurisdiction upon courts to interfere with
the acts of the executive officers while proceeding in
pursuance of its requirements: *State of Mississippi* v.
*Johnson,* 71 U. S. (4 Wall.), 498. True, the board is em-
powered to make payment upon contracts as the work
progresses, and it is contemplated that such payments
and disbursements shall be made out of the public
funds so appropriated by the legislature, but neither
the governor nor the board can obtain a dollar of such
funds without a warrant from the secretary of state,
by the very terms of the acts themselves. There is
no intimation anywhere that the secretary is about to
or is intending to draw, or contemplating the drawing
of, any warrant against such fund, or any public fund
of the state. Indeed, the secretary of state, acting in
his capacity as such officer, is not a party to the suit.
The judiciary takes cognizance of those proceedings
only, if at all, which operate incidentally as a check
upon a coördinate branch of government. It may, in
a proper case, proceed against an officer engaged in
the discharge of purely ministerial functions, which
may indirectly or incidentally affect the acts of a coör-
dinate branch, and even nullify and render them inop-
erative; but directly, as against officers acting in a
political, governmental, or discretionary capacity, it
never has and never will, so long as the relative
duties and powers of the coördinate departments are
justly observed: *Gaines* v. *Thompson,* 74 U. S. (7 Wall.),
347.

5. Moreover, it is not fit that these great powers
pertaining to sovereignty, which affect the whole peo-

ple alike, and none less nor more than the rest, should be invoked by individual citizens, or by a class or classes, or body corporate, or an aggregation thereof less than the whole state.   State officers should not be subjected to the annoyance of a suit at the instance of every individual, when civil or property rights are not invaded, who might conceive that the laws were being improperly administered, or that public funds were not being applied to legitimate public purposes. State government being divided into three coördinate branches,—executive, legislative, and judicial,—it is most essential to the preservation of the autonomy of government that there be no encroachment of one branch upon another.   And to this end the just limitations of the constitutional powers accorded to either branch should be nicely defined and jealously guarded. But sometimes one branch of government, in the discharge of its coördinate functions, oversteps the limit of its constitutional powers.   In such a case one or both of the other branches of government may operate as a check upon its action.   The legislature may pass an act in disregard of the inhibitions of the constitution.   The executive may veto the measure, or, failing to do so, the judiciary may refuse to recognize it as controlling.   The governor acts upon his own motion, and by right of high constitutional powers and privileges reposed in him.   The judiciary acts, not upon its own motion, but only when some suitor duly authorized by law presents in due form a cause appropriate for its cognizance.   Its machinery may be set in motion by private suitors, in some form or another, in all cases where civil or property rights are being invaded or intrenched upon to their injury or damage, be the suitor ever so humble or the injury to be encountered ever so small; but in all cases of

purely public concern, affecting the welfare of the
whole people, or the state at large, the court's action
can only be invoked by such executive officers of state
as are by law intrusted with the discharge of such
duties. The attorney-general was such an officer at
common law. Under the constitution (article VII, sec-
tion 17) the prosecuting attorneys are made the law
officers of the state and of the counties within their
respective districts. These officers, says WALDO, J.,
in *State* v. *Douglas County Road Company,* 10 Or. 201, are
possessed "with the powers, in the absence of statu-
tory regulation, of the attorney-general at common
law." When the office of attorney-general was created,
it was made the duty of the incumbent to "prosecute
or defend for the state all causes in the supreme
court in which the state is interested": Laws, 1891,
p. 188. Whether his duties and powers in any manner
supersede those of the prosecuting attorneys it is not
now necessary to inquire; but a vital question here is
whether this proceeding has been properly instituted
by the law officer of the state, whether he be a pros-
ecuting attorney or the attorney-general. The plead-
ing, by virtue of which it is contended the court
should take and entertain jurisdiction, may properly
be termed a bill in equity by a private individual, to
wit: A. C. Taylor, the relator. It is verified by him,
and purports to be his bill, and not the information
of the district attorney for the third judicial district,
although signed by that officer. We have seen that
at common law, if a private invidual had an interest
in the proceeding apart from the interest of the gov-
ernment, he might as relator have his bill incorpo-
rated with the information of the attorney-general,
which was denominated an "information and bill."
In practice, if it should afterwards appear that the

relator had no interest to be subserved, the bill was
dismissed, and the information retained: *Attorney-General*
v. *Vivian,* 1 Russel, 236, 237; *State* v. *Cunningham,* 81 Wis.
440 (15 L. R. A. 561, 51 N. W. 724). But do we find
here what may be termed an information or bill by
the law officer of the state? As such an officer is the
only person competent to institute a proceeding of the
nature under consideration, the information should
show upon its face in no uncertain manner that he is
the officer instituting and prosecuting the suit, and
the sole person responsible for its inception and main-
tenance. The most common form of instituting like
proceedings, it seems, has been in the name of the at-
torney-general: *Coosaw Mining Company* v. *South Carolina,*
144 U. S. 565 (12 Sup. Ct. 689). Less frequently they
are brought in the name of the Crown or the state
upon the relation of the attorney-general: *State ex rel.*
v. *Hibernian Savings Association,* 8 Or. 396. And, if per-
missible at all to bring the suit in the name of the
state alone, the complaint or information should show
upon its face that the appropriate law officer brings
the same for or in behalf of the state. The proceed-
ing in either form would fix the responsibility for the
maintenance thereof upon that officer, and it is not be-
lieved that the mere affixing of his signature in his
official capacity to a complaint or bill shown to be
the bill of a private relator is sufficient to impress it
with the functions and capacity of an information com-
petent to put in motion the machinery of the courts,
whereby they will take cognizance of questions per-
taining to the high prerogative powers of the state, or
affecting the whole people in their sovereign capacity:
See *State* v. *Saline County Court,* 51 Mo. 350; *Bigelow* v.
*Hartford Bridge Company,* 14 Conn. 578 (36 Am. Dec. 502);
*State* v. *Anderson,* 5 Kan. 115; *Buck Mountain Coal Company*

v. *Lehigh Coal Company,* 50 Pa. St. 100; *Iroquois County Supervisors* v. *Keady,* 34 Ill. 296; *People* v. *Pacheco,* 29 Cal. 213; *Attorney-General* v. *East India Company,* 11 Sim. 380; *Bobbett* v. *State,* 10 Kan. 15; *United States* v. *Throckmorton,* 98 U. S. 70. Having reached these conclusions, the decree of the court below will be reversed, and the complaint dismissed.

6. This leaves the constitutional question still undisposed of, and the fact that we would probably not declare the acts to be unconstitutional cannot affect or change our duty in the premises. Courts will not assume to pass upon a question of that character unless properly before them; and the case at bar, as presented, not being within our jurisdiction to hear and determine, it is clearly not within our province to assume now to decide that question, although of grave public importance· "As a general rule a court will not pass upon a constitutional question and decide a statute to be invalid unless a decision upon that very point becomes necessary to a determination of the cause." LORD, J., in *Elliott* v. *Oliver,* 22 Or. 47 (29 Pac. 1). We said when this case was here before that "this rule arises out of the due respect which one coördinate branch of the state government entertains towards another. The legislature, in adopting laws for the government of the people, does so under its construction of the constitution, and the just presumption always prevails that the business of the legislature is transacted with due regard to the fundamental law by which its acts are limited and governed. It must be a clear case, therefore, and one in which the constitutional question is the very *lis mota,* before courts will assume the responsibility of declaring an act of the legislative assembly void upon constitu-

tional grounds, and reverse the judgment of a coördinate branch of the state government. The case before us affords a striking illustration of the soundness of this doctrine. The law complained of was passed at two succeeding sessions of the legislative assembly, and received the approval of two executives of the state. By the last act an expenditure of twenty-five thousand dollars under the former in the purchase of a site for the branch asylum is approved, as well as all other acts of the board in pursuance of its provisions. At the time of the passage and approval of the latter act, this case was pending in the courts, which fact was strongly calculated to attract the attention of both the legislative and executive branches of the state government to the direct point at issue, and it is but just to assume that the question of its constitutionality was duly and carefully considered. Hence, the peculiar gravity of our assuming at this time to pass upon the constitutional question so ably and elaborately presented at the hearing. Being inhibited by the rule under discussion, we cannot go into the question.

7. These conclusions are concurred in by the full bench, but the majority of the court are of the opinion that such conclusions are susceptible of support on other grounds, and in this connection I will proceed to state them. The power of a court of equity, in a proceeding by the attorney-general or district attorney to enjoin the issuance of warrants in payment for the Eastern Oregon Asylum,—as is heretofore intimated might be done if it be conceded that the act locating it is in violation of the Contitution,—it is believed, is involved in grave and serious doubt, and further, the facts in the case do not seem to bring it

within any recognized equity jurisdiction. It is not claimed, nor can it be, that the objects and purposes of the acts in question are unconstitutional, or that the defendants threaten to apply the public funds to an unconstitutional use, or to waste or dissipate them. The claim is that the legislature has directed that the branch asylum shall be located at a place other than the seat of government, in violation, as plaintiff claims, of the duty imposed upon it by the Constitution; and this, it is asserted, is sufficient ground upon which a court of equity should assume jurisdiction. This is not enough. The construction and location of public buildings of the character in question is purely a public governmental question, belonging to the legislative and governmental departments, and affects no private or property right. Nor do the facts of this case justify the conclusion, as a matter of law, that it would be of any pecuniary injury to the state. If the legislative and executive departments have misconstrued the constitution in this regard, their responsibility is to the people. A court of equity cannot, for that reason alone, assume the right to sit in judgment on their acts. There is no authority to be found in the Constitution or statutes of this state for the exercise of such an extraordinary power, nor is it believed it can be found in the analogies of the common law. In this state the distinction between common law and equity as a matter of substance prevails, although both jurisdictions are invested in the same court: *Ming Yue* v. *Coos Bay Railroad Company,* 24 Or. 392 (33 Pac. 641). And, it being well settled that a court of chancery is conversant only with the maintenance of property rights, it has no jurisdiction to interfere with the duties of the other departments of government, except when necessary to the protection of such

rights, and cannot even then interfere with the dis-
cretion invested in either of such departments.    ''The
office and jurisdiction of a court of equity,'' says Mr.
Justice GRAY, in *Re Sawyer*, 124 U. S. 210, (8 Sup.
Ct. 482,) ''unless enlarged by express statute, are lim-
ited to the protection of rights of property.''    And in
*Sheridan* v. *Colvin*, 78 Ill. 247, it is said: ''It is elemen-
tary law that the subject matter of the jurisdiction of
the court of chancery is civil property.    The court is
conversant only with questions of property, and the
maintenance of civil rights.    Injury to property,
whether actual or prospective, is the foundation on
which the jurisdiction rests.    The court has no juris-
diction in matters merely criminal or merely immoral,
which do not affect any right to property.    Nor do
matters of a political character come within the juris-
diction of the court of chancery.    Nor has the court
of chancery jurisdiction to interfere with the public
duties of any department of government, except un-
der special circumstances, and when necessary for the
protection of rights of property.''    See also *Green* v.
*Mills*, 69 Fed. 852, (30 L. R. A. 90, 16 Cir. Ct. App. 516,)
and authorities cited by Mr. Justice GRAY in *Re Saw-
yer*, 124 U. S. 210 (8 Sup. Ct. 482).

The several departments of government are each
independent of the other.    To the judicial department
is intrusted the determination of rights and the en-
forcement of remedies, and, as an incident to the pro-
tection of property, a court of equity has the un-
doubted right to refuse to recognize as valid a clearly
unconstitutional act of the legislature, because the con-
stitution is the paramount law of the land, which
every suitor can invoke when an infringement of his
rights is threatened under some law in violation
thereof.    But the mere fact that an act of the legisla-

ture is alleged to be unconstitutional gives it no jurisdiction to determine that question. Its duty is to determine actual controversies, when properly brought before it, and not to give opinions upon mooted questions or abstract propositions. Before it can assume to determine the constitutionality of a legislative act, the case before it must come within some recognized ground of equity jurisdiction, and present some actual or threatened infringement of the rights of property on account of such unconstitutional legislation. When the question, as here, is *publici juris* alone, affects no property rights, and no threatened waste of the public funds is shown, it may be well doubted whether the court has any more power to interfere with the duties of the other departments on the ground that their acts may be unconstitutional, than it has with their discretionary powers or duties. The independence of the different departments in this respect is so complete that, however ill advised the action of the legislature or executive may be, and no matter how gross an error may be committed, a court of equity is nevertheless powerless to interfere when rights of property are not involved, unless express authority is conferred upon it to do so. The decision of a large class of public questions must, in the very nature of the case, be left to the legislative and executive departments, and when the decision is made it must be accepted as correct. Among these is the construction and location of public buildings, and the presumption is just as conclusive that in the discharge of this duty they observe the provisions of the constitution as it is that the courts properly interpret that instrument when called upon to do so in discharge of the duty intrusted to them. It is true that by this rule, practically, public or private interests may sometimes suffer

in either instance, although theoretically there are no such cases. But, however gross the wrong in fact committed by the other departments, a court of equity is powerless to remedy it, unless property rights are involved, or appeal to the judiciary is given by law. No greater evil could exist, under our form of government, than the usurpation by the judiciary of powers not intrusted to it. It should therefore refuse, under all circumstances, to assume jurisdiction in any case which affects the powers, duties, or prerogatives of the other departments of government, unless its right to do so is so clear as to admit of no reasonable doubt. In the opinion of the majority of the court, this record does not present such a case. No great public wrong is threatened, nor will public justice or individual rights suffer by the execution of the law in question. And more, it must be admitted that the construction sought to be placed upon the constitution by the plaintiff is at least open to serious question. It has, for almost a quarter of a century, received a practical exposition to the contrary by the legislative and executive departments, each of which is as much bound to obey the constitution as the courts, and to this exposition the courts would be bound to yield, in a proceeding properly within their jurisdiction, unless satisfied that it is repugnant to the plain provisions of the constitution. Indeed, the very act locating the branch asylum at Union, the execution of which is now sought to be enjoined, was passed by the legislature with only three dissenting votes, while this suit was pending and its constitutional right to enact such a law thereby challenged. Moreover, it was approved by the present executive, whose eminent legal attainments and familiarity with the question, (it having been argued before him in

*Sherman* v. *Bellows,* 24 Or. 553, 34 Pac. 54°,) justly entitles his opinion in the matter to great respect. The court is bound, therefore, to assume that in the opinion of the legislature and executive there is no constitutional inhibition against the passage of such a law, and while none of these facts would excuse the court from assuming jurisdiction, if its right to do so was clear, nor would the exposition given the constitution by the other departments be absolutely controlling upon it when called upon in the discharge of its duty to construe that instrument, yet they afford a very persuasive argument why the court should not struggle to find some grounds, doubtful at best, upon which it can rest its jurisdiction. Before it could assume the power to question the legality of the action of the other departments of government in such a case its right to do so ought to be beyond all possible question, and it ought to be able to place its jurisdiction upon some well settled ground for equitable interference, which it is believed cannot be done in this case. Let an order be entered dismissing the complaint and dissolving the injunction.

REVERSED.

March 2, 1896.

ON REHEARING.

PER CURIAM. Since delivering the opinion in this case, an elaborate petition for rehearing has been filed. We have carefully examined it, and, while some of the points made at the hearing are presented in a new light and with much force, there is no new question made not considered by us in the former opinion. We see no reason for changing the conclusions then reached, hence a rehearing is denied.

REHEARING DENIED.