### ANDERSON v. SMITH, Treasurer.

No. 3453–A.

First Division. Juneau.

Jan. 22, 1934.

H. L. Faulkner, of Juneau, for plaintiff.

James Truitt, Atty. Gen., for defendant.

ALEXANDER, District Judge.

The territorial Legislature of 1933 enacted chapter 30 (Session Laws of Alaska 1933), imposing inter alia a license fee of $25 per annum on nonresident fishermen, who are citizens of the United States, as against $1 per annum on resident fishermen, and this suit is brought by plaintiff to test by injunction the validity of that act.

■■■ It is first contended "that the act in question was not made and passed by the Legislature for the purpose of raising revenue, but was passed for the purpose of regulating the salmon fishing industry in Alaskan waters."

The purpose of the legislature in enacting tax laws must be gathered from the statutes themselves and not from the allegations of the bill attacking them. Alaska Fish Salting & By-Products Co. v. Smith, 255 U.S. 44, 41 S.Ct. 219, 65 L.Ed. 489, and cases there cited.

The act in question declares its purpose in its title, which reads, "An Act to provide for the licensing of fishermen in the Territory of Alaska," etc. and declares the tax complained of to be a license tax or fee, section 2 thereof providing, "*Licenses* to fish in the waters of Alaska shall be issued by the Treasurer of the Territory," etc., and then provides:

"The license fees shall be as follows:

"(a) For each resident fisherman of all classes $1.00;

"(c) For each non-resident fisherman, who uses gill nets $25.00."

There can therefore be no question about the purpose of the act or the nature of the tax imposed. Both are stated in plain and unambiguous language in both the title and body of the act itself.

It is next contended that said act discriminates against citizens of the United States who are nonresidents and who

474

fish by means of gill nets, in favor of resident fishermen, and that resident gill net fishermen are required to pay a license fee of only $1 per year, which entitles them to fish the whole year, either by means of gill nets, seines, trolling lines and hooks, or in any other manner, while a nonresident gill net fisherman, who is a citizen of the United States, can carry on his occupation during the period only of approximately twenty-three days, and is required to pay a license fee of $25 per year, or more than as much per day as a resident fisherman is required to pay per year.

It is true that the act discriminates in favor of resident fishermen as against nonresident fishermen in that it fixes the license fee for resident fishermen at $1 as against $25 for nonresident fishermen; but the allegation that the resident fisherman can fish a whole year on his license while the nonresident fisherman can carry on his occupation only twenty-three days is pure rot. Both are issued exactly the same kind of license and have exactly the same privileges thereunder, and, if the nonresident fisherman only sees fit to use his license twenty-three days out of the year, that is his concern and not the fault of the law. The buyer of an automobile license might as well complain that the license law discriminates against him because he uses his automobile only on Sundays or holidays whereas other people used their automobiles every day, even though both were issued exactly the same kind of license. The material fact in this regard is that the fishing license issued to nonresident citizens is exactly the same license issued to resident citizens, and gives to the nonresident citizen the same right to fish and for the same length of time as a resident fisherman, and the fact that he chooses to use it for only twenty-three days, as alleged, is his affair and his alone, and he cannot be heard to complain because of his failure to exercise that right.

The right to discriminate in favor of its own citizens as against nonresidents is so well established and so universally practiced as to need no argument or justification here. The only limitation upon such right is that such dis-

crimination shall not be arbitrary or unreasonable, and that, where classified, all persons within the class must be treated alike. Cooley on Constitutional Limitations (6th Ed.) 479–481; Bell's Gap R. Co. v. Penn., 134 U.S. 232, 10 S. Ct. 533, 33 L.Ed. 892; Missouri v. Lewis, 101 U.S. 22, 25 L.Ed. 989; Toyota v. Hawaii, 226 U.S. 184, 33 S.Ct. 47, 57 L.Ed. 180; 26 R.C.L. 243, 244.

It is next contended that the act in question deprives plaintiff of his constitutional rights and his right to the equal protection of the law and his right as a citizen of the United States to fish in the territorial waters of Alaska.

To this I cannot agree. The plaintiff has no constitutional right to fish in the territorial waters of Alaska, and has not been deprived of any constitutional right or of the equal protection of the law in that regard, but has the same right as all other citizens, similarly situated, to exercise that right by paying the license tax imposed by the territorial Legislature therefor.

It is further contended that plaintiff will either be required to comply with the aforesaid act or be subject to fines and imprisonment and assessments as therein provided, and that he (the plaintiff) and other fishermen, similarly situated, will thereby suffer irreparable injury and be deprived of their property and liberty without due process of law, unless the injunction herein issue as prayed for, that said discrimination is unlawful and unreasonable in that the territory has no power to tax nonresident fishermen, who are citizens of the United States, more than resident fishermen for the privilege of fishing in Alaskan waters; it being alleged that power is expressly reserved in the Congress by section 3 of the Organic Act of 1912 (48 U.S.C.A. §§ 23, 24, 80), and was expressly exercised by the Congress by the enactment of the White Act (Act of June 6, 1924, 48 U.S.C.A. §§ 221 and note, 222 et seq.), authorizing the Secretary of Commerce to set apart and reserve fishing areas in any waters of Alaska over which the United States has jurisdiction and within such areas to establish closed

seasons during which fishing may be limited or prohibited as he may prescribe, etc., and that he has no speedy or adequate remedy at law.

To the plaintiff's complaint, the Attorney General, on behalf of the defendant, has demurred on three grounds:

First. That the court has no jurisdiction of the subject-matter of the alleged cause of action under any recognized rule of equity.

· Second. That there is a nonjoinder of parties plaintiff; the complaint alleging over fifteen hundred other unnamed nonresident gill netters are similarly situated and seeking to void the law by this suit.

Third. That the complaint does not state facts sufficient to constitute a cause of action nor entitle the plaintiff to the relief demanded.

On the argument of this matter to the court, the Attorney General vigorously stressed the point that the plaintiff had an adequate remedy at law, in that he could, first, plead the illegality of the tax in defense to any criminal prosecution brought under said act; or, second, that plaintiff could pay the tax under protest and then recover the same by a proper action at law, if the law were declared illegal.

It is to the third ground of demurrer that I shall now address my attention, as I do not deem it necessary to consider either the first or second grounds assigned.

It may be broadly stated as the rule that a court of equity has no jurisdiction, or at least will not entertain jurisdiction, where there is an adequate remedy at law. Equity follows the law. The office of equity is to supplement, and not to supplant, the law. 10 R.C.L. 273, 274.

The adjudicated cases lay down the rule that injunction, frequently spoken of as the strong arm of equity, is summary, peculiar, and extraordinary, and ought not to be exercised except for the prevention of great and irreparable mischief. Being extraordinary, it ought to be exercised with great caution and applied only in very clear

cases and only in such manner as to prevent injustice and unnecessary injury.

■ Further extended, the general rule is that a court of equity has no jurisdiction or power to interfere by injunction to arrest the authorities charged with the execution of the criminal laws. Nor is the equitable doctrine of multiplicity of suits applicable in such cases.

■ The only well-recognized exception to this rule is where substantial property rights are involved or irreparable injury threatened. And this is true even though the law or ordinance involved is invalid, as there is ordinarily an adequate remedy at law. The theory on which these cases proceed is that, if the law should be held valid, the courts cannot punish the complainant for the offenses committed or compensate those injured by his wrongful acts while the hands of the officers of the law are stayed by injunction, and it is said that the exercise of the jurisdiction contended for would greatly confuse and embarrass the enforcement of the police power, and on sound principles of public policy ought not to be favored.

■ In line with this view it has been generally held that equity has no jurisdiction to enjoin threatened criminal proceedings although it be charged that the statute involved is invalid and that a multiplicity of actions thereunder will injure and destroy civil and property rights of the complainants and that the damages resulting will be irreparable, when the defense thereto in a court having jurisdiction of the offense is adequate and unembarrassed. 14 R.C.L. 433.

■■ The mere fact that a law is alleged to be unconstitutional does not confer jurisdiction on courts to interfere with acts of executive officials while proceeding in pursuance of its requirements.

"The duty of a court is to determine actual controversies, when properly brought before it, and not to give opinions on mooted questions or abstract propositions. Before it can assume to determine the constitutionality of a legislative

act, the case before it must come within some recognized ground of equity jurisdiction and present some actual or threatened infringement of the rights of property on account of such unconstitutional legislation, and where it is apparent that the remedy at law is adequate, relief will be refused." 14 R.C.L. 435, 436; State ex rel. Taylor v. Lord, 28 Or. 498, 43 P. 471, 31 L.R.A. 473–483.

There has long been a growing aversion on the part of the public to the courts assuming equitable jurisdiction by interlocutory injunction to suspend or restrain the enforcement, operation, or execution of a state statute by restraining the action of an officer of such state in the enforcement or execution of such statute, particularly where they involve tax matters, based on what this court believes to be a sound public policy and a very definite and adverse public opinion.

This public opinion crystalized into law as long ago as 1910 by the enactment of our federal statute (Sections 379–380, 28 U.S.C.A.) providing, in substance: "§ 380. No interlocutory injunction suspending or restraining the enforcement, operation, or execution of any statute of a State by restraining the action of any officer of such State in the enforcement or execution of any such statute, or in the enforcement or execution of an order made by any administrative board or commission acting under and pursuant of the statutes of such State, shall be issued or granted by any justice of the Supreme Court, or by any district court of the United States, or by any judge thereof, or by any circuit judge acting as district judge, upon the ground of the unconstitutionality of such statute, unless the application for the same shall be presented to a justice of the Supreme Court of the United States, or to a circuit or district judge, and shall be heard and determined by three judges, of whom at least one shall be a justice of the Supreme Court or a circuit judge, and the other two may be either circuit or district judges, and unless a majority of said three judges shall concur in granting such application."

This act of Congress, while not controlling here, nevertheless gives us some idea of the dignity and importance the Congress of the United States attaches to such matters as the one now before me, and should be of some persuasive value even in our state or territorial courts in the consideration of like cases.

■■■■ It is probably sufficient to say that I agree with the contentions of the Attorney General that the complaint herein does not state facts sufficient to entitle the plaintiff to the relief demanded. ·

In my opinion the act in question was a valid exercise of the legislative powers conferred upon it by the Organic Act, and is not unreasonable or discriminatory; and that plaintiff has a speedy and adequate remedy at law, in that I believe, as contended, that the plaintiff can plead the illegality of the act in defense to any criminal prosecution brought under said act, or can pay the tax under protest and then recover the same by a proper action at law if the law is declared illegal.

Mr. Chief Justice Fuller, in Arkansas Bldg. & Loan Association v. Madden, 175 U.S. 269, 272, 20 S.Ct. 119, 120, 44 L.Ed. 159, quoting Mr. Justice Fields in Dows v. Chicago, 11 Wall. 108, 20 L.Ed. 65, thus states the law:

" 'The party of whom an illegal tax is collected has ordinarily ample remedy, either by action against the officer making the collection or the body to whom the tax is paid. * .* * If the tax was illegal, the plaintiff protesting against its enforcement might have had his action, after it was paid, against the officer or the city to recover back the money, or he might have prosecuted either for his damages. No irreparable injury would have followed to him from its collection. Nor would he have been compelled to resort to a multiplicity of suits to determine his rights.' * * * Payment would, under the circumstances detailed, be compulsory and not voluntary, and no reason is perceived why the rule permitting recovery back would not apply. * * *

" 'The law is established that when a person by the compulsion of the color of legal process, or of seizure of his person or goods, pays money unlawfully demanded he may recover it back.' The fact that the defendant is a state official is not in itself a defense, and our attention has been called to no statute of Texas which substitutes any other for the common-law rule. Inasmuch as the bill [there as here] contains nothing to indicate inability on the one hand to pay the franchise tax in question, or, on the other, to respond in judgment if it were found to have been illegally exacted, and sets up no special circumstances justifying the exercise of equity jurisdiction other than consequences which complainant can easily avert, without loss or injury, we are of opinion that it [the bill asking the injunction] cannot be sustained."

He then very pertinently adds: "It is quite possible that in cases of this sort the validity of a law may be more conveniently tested, by the party denying it, by a bill in equity than by an action at law, but considerations of that character, while they may explain, do not justify, resort to that mode of proceeding."

Nor is there anything new in Chief Justice Fuller's pronouncement. In Erskine v. Van Arsdale, 15 Wall. 75, at page 77, 21 L.Ed. 63 (an early case), it was said by Chief Justice Chase: "Taxes illegally assessed and paid may always be recovered back, if the collector understands from the payer that the taxes are regarded as illegal and that suit will be instituted to compel the refunding of them."

Counsel for plaintiff stoutly contends, however, both in his argument and brief, "that the territorial legislature has no power to tax non-resident citizens more than resident citizens for the privilege of fishing (by use of gill nets) in Alaskan waters."

The Organic Act of the territory of Alaska, passed in 1912 (37 U.S.Stat. 512), provides inter alia that the Legislature shall have no power to alter, amend, or repeal the fish laws, but it is, in section 3 thereof (48 U.S.C.A. § 24),

further provided that "This provision shall not operate to prevent the legislature from imposing other and additional taxes or licenses."

The right to tax is inherent, and is the very life blood through which every governmental power is exercised. The Congress recognized that fact in the Organic Act, and, while reserving to itself authority over the customs, internal revenue, postal, game, and fish and other general laws of the United States, specifically provided therein that "This provision shall not operate to prevent the legislature from imposing other and additional taxes or licenses." 48 U.S. C.A. § 24. Neither is there any question about the right of the territorial Legislature of Alaska to impose such a tax.

In the case of Haavik v. Alaska Packers' Association, 263 U.S. 510, 44 S.Ct. 177, 68 L.Ed. 414, which challenged the validity of an act of the 1919 Alaska Legislature imposing an annual head tax of $5 upon every nonresident fisherman, Mr. Justice McReynolds said: "Plainly, we think, the territorial Legislature had authority under the terms of the Organic Act to impose both the head and the license tax, unless, for want of power, Congress itself could not have laid them by direct action."

He then affirms that Congress had such power, and adds: "Unless restrained by constitutional provision, the sovereign has power to tax all persons and property actually within its jurisdiction and enjoying the benefit and protection of its laws. * * *' The license tax [here involved] cannot be said to conflict with section 2, art. 4 of the Constitution: 'The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states.' It applies only to nonresident fisherman; citizens of every state are treated alike. Only residents of the territory are preferred. This is not wholly arbitrary or unreasonable, and we find nothing in the Constitution which prohibits Congress from favoring those who have acquired a local residence and upon whose efforts the future development of the territory must largely depend. * * * To require

him [the plaintiff] to contribute something towards its [the territory's] support did not deprive him of property without due process of law, within the Fifth Amendment."

Alaska levies no direct property tax. The only taxes collected are in the form of excise or license taxes on business. These, in varying forms, have been uniformly upheld by the courts. Alaska Fish Salting, etc., Co. v. Smith, 255 U.S. 44, 41 S.Ct. 219, 65 L.Ed. 489; Haavik v. Alaska Packers Association, 263 U.S. 510, 44 S.Ct. 177, 68 L.Ed. 414; Pacific American Fisheries v. Alaska, 269 U.S. 269, 46 S. Ct. 110, 70 L.Ed. 270; Alaska Pacific Fisheries v. Alaska (C.C.A.) 236 F. 52; Hoonah Packing Company v. Alaska (C.C.A.) 236 F. 61; Alaska Mexican Gold Mining Co. v. Alaska (C.C.A.) 236 F. 64; Alaska Pacific Fisheries v. Alaska (C.C.A.) 236 F. 70; Northern Commercial Co. v. Alaska (C.C.A.) 289 F. 786; Alaska Packers' Association v. Hedenskoy (C.C.A.) 267 F. 154.

Some of the above cases go even further and hold that, in exercising its taxing power on fish or fish canneries the Legislature may consider (in addition to the revenue concerned) the collateral advantages of fish protection. Pacific Am. Fisheries v. Alaska, 269 U.S. 269, 46 S.Ct. 110, 70 L.Ed. 270.

Plaintiff's counsel, however, contends that, since the case of Haavik v. Alaska Packers' Association, supra, was decided in 1923, Congress has passed a new law to regulate the fisheries of Alaska, and that this law, Act of June 6, 1924, section 222, title 48, U.S.C.A., contains a provision which counsel claims gives to all citizens of the United States, irrespective of residence, the right to fish in Alaskan waters and on equal terms. The pertinent part of that act cited by counsel reads as follows: "Nor shall any citizen of the United States be denied the right to take, prepare, cure, or preserve fish or shell-fish in any area of the waters of Alaska where fishing is permitted by the Secretary of Commerce."

Taken alone, this paragraph might seem to bear out counsel's contention, but, when the act is read as a whole, there can be no conjecture about either the purpose or scope of the act, as section 8 of the same act (43 Stat. 467, see 48 U.S.C.A. § 228) specifically provides: "Sec. 8: Nothing in this Act contained, nor any powers herein conferred upon the Secretary of Commerce, shall abrogate or curtail the powers granted the Territorial Legislature of Alaska to impose taxes or licenses, nor limit or curtail any powers granted the Territorial Legislature of Alaska by the Act of Congress approved August 24, 1912 [the Organic Act], 'To create a legislative assembly in the Territory of Alaska, to confer legislative power thereon, and for other purposes.'"

The history of this legislation shows that section 8 of the act above quoted was added to the bill after the bill had passed the House and was before the Senate for consideration, and that its very purpose was to clarify the first-quoted provision of the act and to retain and guarantee to the territorial Legislature of Alaska all the powers conferred on it by the Organic Act, Act of August 24, 1912 (37 Stat. 512). It therefore appears beyond the pale of argument that, if the Legislature had the power to enact such a tax law prior to 1924, as the Supreme Court of the United States said it had in the Haavik Case and other cases cited, it seems clear that it still has that power. Nor is there anything to the contrary in the two appeals of Wood Freeman v. Smith (C.C.A.) 44 F.(2d) 703; Id. (C.C.A.) 62 F.(2d) 291, 293. Both the power to impose taxes and license and to make reasonable discrimination between residents and nonresidents is there admitted and reiterated. The court did, however, say that this power to tax cannot be so exercised as to defeat the general purpose of Congress or destroy rights conferred by Congress upon citizens of the United States to fish in Alaskan waters, and held, in substance, that the act there involved would in effect, by imposing a tax of $250 on nonresident fishermen, defeat or destroy the rights conferred by Congress upon all citizens of the United States to fish in Alaskan waters, by making

a license fee so high as to be prohibitive, and that this right to tax cannot be carried to the extent of destroying rights conferred by the Constitution or laws of the United States.

On the question of the reasonableness of the tax so involved in the cases of Freeman v. Smith, the court said, "The exaction of 50 per cent. of the net receipts of the average troller as a license fee was unreasonable and violative of the right granted by Congress to fish in Alaskan waters"; but the present act presents an entirely different situation.

The act now under consideration provides for a license fee of only $25 on nonresident fishermen as against $250 in the act involved in the Freeman Case, and cannot be held so unreasonable or prohibitive as to invalidate the Act and justify the court in assuming jurisdiction here.

Courts of equity are especially slow to assume jurisdiction in cases involving the collection of public revenues.

Corpus Juris lays down the broad principle that: "For cogent reasons of public policy, the courts are slow to interfere with the orderly and speedy collection of the public revenues, and will not interfere with proceedings to enforce the payment of taxes except in the clearest cases for the most imperative reasons," 61 C.J. 1070.

And our court of last resort has held that courts of chancery are equally loath to assume jurisdiction to interfere with the enforcement and collection of revenue, excise or tax, and the mere fact that a law which authorizes such a tax is alleged to be unconstitutional will not, of itself, be sufficient to induce the courts of equity to assume jurisdiction over such matters, but it must be further shown that either some irreparable injury will result, or some other equally well-recognized ground of equity jurisdiction must be asserted, before an injunction will be issued (which are not here shown). Shelton v. Platt, 139 U.S. 591, 11 S.Ct.

646, 35 L.Ed. 273, cited in note to Harley v. Lindemann, 8 L.R.A.(N.S.) 125.

■■ The right of taxation is inherent in every sovereign state and equally so in every territory when empowered by the sovereign state (in this case the national government) to set up and maintain a territorial government. Such a right is the very life blood of the state or territory, without which it can neither function nor exist, and, in such an economically undeveloped territory as ours, where the principal sources of revenue are its natural resources, such as fishing, etc., if the territory cannot tax the right or privilege of taking such fish and in so doing discriminate in favor of its own citizens or residents, then the territory will be deprived of one of its most ready sources of revenue, and its citizens will be likewise deprived of probably their most fruitful source of income and both suffer proportionately.

I have read the briefs and all the authorities cited by both plaintiff and defendant and a large number of others in addition, and, based on the broad principles announced, which I consider well established, and the few authorities which it seems necessary to cite specifically, the court is of the opinion that the complaint, for the reasons stated and for other reasons not necessary to state at this time, does not state facts sufficient to justify this court in assuming the extraordinary jurisdiction sought to be applied.

The demurrer herein will therefore be sustained, and an order may be entered accordingly.